Nancy KIOKUN and Cynthia Olrun, Petitioners,

v.

STATE of Alaska, DEPARTMENT OF PUBLIC SAFETY, Respondent.

State of Alaska, Department of Public Safety, Appellant/Cross–Appellee,

v.

Nancy Kiokun and Cynthia Olrun, Appellees/Cross–Appellants.

Nos. S–9044, S–9558, S–9563.

Supreme Court of Alaska.

July 25, 2003.

Venable Vermont, Jr. and Gary M. Guarino, Assistant Attorneys General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for State of Alaska.

Kari L. Bazzy Garber, Garber & Bazzy, P.C., and Don C. Bauermeister, Burke & Bauermeister, P.L.L.C., Anchorage, for Nancy Kiokun and Cynthia Olrun.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## 1. INTRODUCTION

Tort plaintiffs claimed the State of Alaska was liable for the deaths of three people who perished in bitter mid-January cold after they left their car in deep snow on a remote, unmaintained road. The plaintiffs claimed the Alaska State Troopers negligently failed to launch a search and rescue after hunters told the troopers late the afternoon of January 15, 1996 they had found an unoccupied car, a "HELP" sign and arrow stamped in the snow, and footprints heading east. The temperature was then forty-five degrees below zero Fahrenheit. About fifty-eight hours later Leah and Palmer Olrun and their young grandson were found dead eight miles from the car. Assuming the troopers owed a tort duty, we hold that the decision whether to initiate a search and rescue is protected by discretionary function immunity. We therefore reverse the judgment entered for the plaintiffs, and remand for entry of judgment for the state.

## II. FACTS AND PROCEEDINGS

Between 5:00 and 5:30 p.m. on January 15, 1996, hunters Marcel Kania and Vernon Rice went to the Cantwell home-office of Alaska State Trooper Ellis.[1] Rice reported to Trooper Ellis's wife by intercom that the hunters had seen an abandoned red Subaru in deep snow on an unmaintained road at Mile 50 of the Denali Highway. They found the car stopped in the middle of the road in about eighteen inches of snow. They saw the word "HELP" and an arrow stamped in the snow, and footprints heading east, toward

Paxson. Rice reported that people were in trouble and needed help. The hunters did not find the car's occupants or report its license plate number or any other identifying features. The car was about fifty miles from Paxson and about eighty miles from Cantwell. It had taken the hunters about two hours and fifteen minutes to reach Cantwell. Trooper Ellis immediately forwarded the information to the Fairbanks State Troopers dispatcher, who relayed it to the Glennallen dispatcher.

At about 6:00 p.m. that night the Glennallen dispatcher contacted Trooper Ellis, who provided all the information he had about the vehicle. The Glennallen dispatcher then contacted Trooper Pierce at the Paxson Lodge and asked him to check for more information around the Lodge. At 6:25 p.m. the Glennallen dispatcher contacted Trooper Heck to advise him of the hunters' report. Trooper Heck asked Trooper Stevenson to travel to the Subaru's location that night via snowmachine. Although Trooper Stevenson initially agreed, both troopers decided that Trooper Stevenson should not travel alone and that it would be best to wait until morning. Trooper Heck returned to the Glennallen post and contacted Trooper Ellis in Cantwell for more information. Trooper Heck also left a message for Sergeant Maynard at his home. Trooper Heck contacted one other trooper before ending his shift. He did not, however, inform the Rescue Coordination Center (RCC) that he would not be coordinating a response that night. Sergeant Maynard advised the Glennallen dispatcher at 10:00 p.m. to have Trooper Pierce call him the next morning.

At 11:30 p.m. January 15 Trooper Siegfried of the Anchorage post was contacted by the Anchorage dispatcher, who reported that Leah Olrun, her husband, and her grandchild were missing, along with their maroon Subaru. Trooper Siegfried searched the Seward Highway for the Olruns between midnight and 2:20 a.m.

At 9:00 a.m. January 16 Sergeant Maynard contacted Captain Clontz and they decided a

---

**1.** The dates and times and other specific facts set out here give context to the legal issues before us. And although we sometimes refer to facts described in the administrative investigation report, the dispositive facts are largely undisputed.

search of the Denali Highway using the Alaska State Trooper helicopter would be feasible when the temperature rose above thirty-five degrees below zero. The temperature was then minus fifty degrees Fahrenheit. At 2:33 p.m. the Anchorage Police Department dispatcher sent an all-points message regarding the Olruns and the vehicle.

At 11:00 a.m. on January 17 a relative of the Olruns reported to Trooper Gibson of the Anchorage post that the Olruns had left Anchorage on Tuesday, January 11, heading toward the Kenai Peninsula. After contacting dispatch and learning about Trooper Siegfried's search earlier that morning, Trooper Gibson informed the relative of the search. At 1:30 p.m. Sergeant Stauber requested a Civil Air Patrol search for the Olruns. After collecting more information, Sergeant Stauber requested permission to authorize a Civil Air Patrol search of the highway between Anchorage and Homer.

At 7:42 p.m. on January 17 Trooper Pierce reported to Sergeant Maynard the connection he made between the "Be On The Lookout" report, the report of the vehicle on the Denali Highway, and the report of the missing Olruns. Sergeant Maynard authorized an immediate search of the Glennallen area. The Olrun vehicle was found at 1:00 a.m. on Thursday, January 18, 1996. Two-and-a-half hours later the Olruns' frozen bodies were found almost eight miles east of the vehicle.

Nancy Kiokun (Leah Olrun's mother) and Cynthia Olrun (daughter of Leah and Palmer Olrun and mother of the decedent child) filed

suit against the State of Alaska and the State Department of Public Safety in December 1997. We refer to the plaintiffs collectively as "Kiokun," and to the defendants interchangeably as the "state" or the "department." Kiokun moved for summary judgment on the issue of the department's duty to rescue. Relying on *Lee v. State*,[2] the superior court ruled as a matter of law that the state had a duty to go to the Olruns' aid and that it had breached that duty. The court ruled that the department was not entitled to discretionary function immunity because the decision to conduct search and rescue operations was operational. The case went to trial and the jury found that the state's negligence was a legal cause of the three deaths and that the department was fifty-one percent responsible for the Olruns' deaths.[3]

This appeal follows.[4]

## III. DISCUSSION

### A. Standard of Review

 Whether a governmental act is entitled to discretionary function immunity is a matter of law.[5] We review questions of law de novo.[6] We review the interpretation of statutes using our independent judgment.[7]

### B. Duty

 Kiokun filed a motion to establish the state's duty to the Olruns[8] and a motion for partial summary judgment. The superior court entered partial summary judgment

**2.** 490 P.2d 1206 (Alaska 1971).

**3.** The jury found that the department was fifty-one percent responsible for the Olruns' deaths. It awarded $1,800,000 for the Olruns' pre-death suffering, $451,996 in economic damages, and $7,480 for funeral expenses. It awarded $3,000,000 to Cynthia Olrun for losses relating to the death of her son and $2,500,000 collectively to all surviving family members for loss of society and mental distress damages.

**4.** Kiokun also filed a petition for review after the trial court ruled that the Alaska wrongful death statute, AS 09.55.580, does not allow claims for loss of adult consortium. The trial court also ruled that the non-economic damages cap under former AS 09.17.010 applied to wrongful death actions and the court applied the cap to the

jury's award. Kiokun cross-appeals these two rulings. Our ruling on the immunity issue makes it unnecessary to consider the issues raised in Kiokun's petition and cross-appeal.

**5.** *Angnabooguk v. State, Dep't of Natural Res.*, 26 P.3d 447 (Alaska 2001).

**6.** *Kooly v. State*, 958 P.2d 1106, 1107 (Alaska 1998).

**7.** *Sauve v. Winfree*, 985 P.2d 997, 999 (Alaska 1999).

**8.** A negligence action may lie against the state if the state owed a duty of care to the plaintiffs. *Mesiar v. Heckman*, 964 P.2d 445, 448 (Alaska 1998).

against the state, ruling that "[t]he State of Alaska through the Alaska State Troopers owed a duty to the Olrun family to go to their aid.... The State of Alaska breached its duty as a matter of law." The superior court relied on *Lee v. State*[9] to support its conclusion.

■ Normally we do not reach the question of AS 09.50.250 discretionary function immunity unless we have first determined that the state owed an actionable duty[10] and that it is at least disputed whether the state breached that duty. The state argues that no actionable duty arose under statute, the department's operating manual, our case law, or public policy. Kiokun argues that the state owed a duty that arose out of statute, assumption of duty, common law, and the department's operating manual.

Notwithstanding our usual practice when we consider issues concerning tort claims against the state and discretionary function immunity, we proceed in this case directly to the immunity analysis because it better illustrates the public policy issues that would also bear on a duty analysis. For our purposes, therefore, we assume that the department owed a duty, arising at some undetermined time, to commence a meaningful search for the Olruns and possibly a rescue attempt.

## C. Immunity

■ The state moved for summary judgment, arguing that its failure to launch an immediate search and rescue was a deci-

sion protected by discretionary function immunity.[11] Kiokun opposed the motion and asserted that the Department of Public Safety Operating Procedures Manual, testimony from a former state trooper, and Alaska statutes and case law all dictated that the decision not to launch an immediate search and rescue was operational and therefore not immune from a tort claim.[12] Although we explain the doctrine in more detail below, it is pertinent to note now that we distinguish between planning activities and operational activities to determine whether the state's actions are immune from a tort claim. Operational activities are not immune.[13]

The superior court granted Kiokun summary judgment on the duty issue, stating orally, "[A] duty to rescue does exist. I rely on *Lee* and its progeny principally in recognizing that duty.... I think there is a duty imposed on police officers by law to rescue people in need." The superior court did not undertake a discretionary function analysis. Instead, it stated, "[t]his behavior ... is operational activity." The court also granted Kiokun summary judgment on the issue of breach of duty. The court reserved the issue of causation for the trial jury.

The state advances three reasons to support its appellate argument that the decision whether to initiate a search and rescue is protected from tort claims by discretionary function immunity. First, it contends that AS 18.60.120 governs search and rescue initiation and is a permissive statute.[14] Because

9. 490 P.2d 1206, 1210 (Alaska 1971) (holding that state trooper had duty to aid girl whose arm was in mouth of lioness at amusement park).

10. *See Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 254 (Alaska 2000); *Kooly*, 958 P.2d at 1108 (deciding first whether there is actionable duty before reaching immunity question).

11. AS 09.50.250 waives sovereign immunity, allowing certain causes of action against the state, while simultaneously shielding state discretionary functions from legal challenge. It provides in pertinent part:

A person ... having a ... tort claim against the state may bring an action against the state in a state court that has jurisdiction over the claim.... However, an action may not be brought under this section if the claim (1) ... is an action for tort, and based upon the exercise or performance or the failure to exercise

or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused.

12. *Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 456 (Alaska 1997) ("Only acts or functions occurring at the planning level are entitled to immunity as discretionary functions under AS 09.50.250.").

13. *Id.*

14. AS 18.60.120 provides:

Upon being notified that a person is lost, injured, killed, or is in need of immediate rescue, the commissioner of public safety or a designee may appoint a competent person to organize, direct, and guide a search and rescue party for the purpose of rescuing or retrieving the person or the person's remains.

the statute uses the word "may," the state concludes that the legislature intended the department to use its discretion when deciding whether to launch a search and rescue operation. The state relies on our decision in *State, Department of Transportation & Public Facilities v. Sanders,*[15] in which we looked to the language of the traffic regulations to determine whether airport officials had a duty to enforce them. We concluded that the use of the permissive "may" meant that the airport officials had discretion whether to enforce the regulations.[16] The state claims that here, as in *Sanders,* we should hold that the permissive language of the statute left the decision whether to launch a search and rescue attempt to the Department of Public Safety's discretion.

Second, the state asserts that the decision whether to initiate a search and rescue is inherently based on resource allocation and is therefore protected as a discretionary function. It relies on cases in which we held that state decisions that involved evaluation of road conditions to determine whether to issue tickets to motorists driving at unreasonable speeds[17] and whether to close the Parks Highway due to ice[18] are protected against tort claims. In those cases we held that the state's decisions were protected from tort claims under the doctrine of discretionary function immunity because the decisions involved evaluation of safety concerns.[19] The department argues that whether to initiate a search and rescue depends on weather conditions, available manpower, and "allocation of scarce emergency rescue resources." It analogizes this case to *Johnson v. United States, Department of Interior.*[20] The United States Court of Appeals for the Tenth Circuit there held that the activities of park rangers in gathering information and deciding whether to initiate a search and rescue

balanced "safety objectives" against practical resource considerations, were "grounded in social and economic policy," and were therefore within the federal discretionary function exception and protected from tort claims.[21]

Finally, the department concedes that it could have been subject to a tort claim had it initiated a negligent search and rescue, but argues that because it did not undertake to rescue the Olruns, it did not assume a duty that would render discretionary function immunity inapplicable. In *State v. Abbott* we held that the state undertook a duty when its winter maintenance of the Seward Highway resulted in more dangerous conditions.[22] Because the state had undertaken the maintenance of the highway, we held that it had undertaken an operational duty and thereby waived its immunity.[23] Similarly, in *Adams v. State,* we held that the decision whether to inspect hotels was a discretionary function but that once the state had inspected a particular hotel it had waived immunity for incidents resulting from the negligent inspection of that hotel.[24] The department argues here that because the troopers did not decide to initiate a search and rescue, they did not undertake an operational duty to rescue the Olruns. (The troopers ultimately did launch a search in the vicinity of the Subaru based on the hunters' report, but the decision to do so was made after the Olruns must have already succumbed to the bitter cold, probably sometime before daylight on January 16.)

Kiokun responds that the department's position is antiquated and inappropriately impersonal. She contends that the legislative history of AS 18.60.120 does not indicate that the legislature intended the statute to immunize the state from lawsuits related to search and rescue decisions. She contends that the decision was operational, because

15. 944 P.2d 453 (Alaska 1997).

16. *Id.* at 457; *see also Wallace v. State,* 557 P.2d 1120, 1123 nn. 7, 8 (Alaska 1976).

17. *Earth Movers, Inc. v. State,* 691 P.2d 281, 283–84 (Alaska 1984).

18. *Estate of Arrowwood v. State,* 894 P.2d 642, 645–46 (Alaska 1995).

19. *Id.; Earth Movers,* 691 P.2d at 283.

20. 949 F.2d 332, 338 (10th Cir.1991).

21. *Id.* at 338, 339.

22. 498 P.2d 712, 715–16 (Alaska 1972).

23. *Id.* at 716.

24. 555 P.2d 235, 240 (Alaska 1976).

the troopers had a mandatory duty to commence a prompt search. Finally, she asserts that the troopers assumed a duty to the Olruns after they promised to follow up on the hunters' report.

■ "[W]e identify 'discretionary' acts or functions by examining whether the act or function can be described as 'planning' or 'operational.' "[25] We distinguish between decisions that involve policy formation and those that involve policy execution or implementation.[26] This ensures that courts do not step into the policy roles committed to other branches of government.[27] The United States Supreme Court has held that "if the policies and programs formulated by the [agency] allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion."[28]

In holding that the state owed a duty to go to the Olruns' aid, the superior court relied on *Lee v. State,* in which we held that a state trooper had a duty to aid a girl whose arm was in the mouth of a caged lioness at an amusement park.[29] Kiokun contends that the duty imposed in *Lee* is inconsistent with granting discretionary function immunity. It might be argued that because the hunters' report revealed that persons were potentially at high risk of injury or death, the same duty to rescue imposed on the trooper in *Lee* also compelled the troopers to respond here.

But the state did not argue in *Lee* that it was protected by discretionary function immunity. (The question there was whether the Alaska Good Samaritan Statute applied. We held that it did not, because the trooper had a duty to respond.[30]) The trooper had actually commenced a rescue effort in *Lee* but allegedly performed it negligently. Moreover, a duty to conduct a search or rescue does not inevitably carry with it a duty to conduct an immediate search and rescue. The difference is illustrated by the differences in the circumstances facing the troopers in each case. In *Lee,* the child's companion ran from the amusement park to a nearby trooper office for help.[31] The lioness had already grabbed the child's arm in its teeth, and the companion had been unable to secure her release by striking the lioness with a pipe.[32] The trooper was able to respond immediately. No issue was raised about any physical or practical reasons for not immediately responding, and there was no claim the trooper failed to respond promptly. In comparison, the limited information the hunters conveyed lacked the immediacy of the report received in *Lee.* More importantly, the formidable distances, climatic conditions, and practical limitations on the available transportation choices made it necessary to consider factors not present in *Lee.*

In contrast, in *Adams v. City of Tenakee Springs,* we held that staffing a fire department was discretionary partly because it was a resource allocation decision.[33] We relied in that case on *Estate of Arrowwood v. State*[34] and *Industrial Indemnification Co. v. State*[35] for the proposition that decisions regarding resource allocation are immune from judicial review. In *Guerrero v. Alaska Housing Finance Corp.,* we held that "what qualifies as a matter of basic planning or policy often depends more on the factual circumstances surrounding an agency's actions than it does on the actions' inherent nature."[36] We quot-

**25.** *Sanders,* 944 P.2d at 456 (citing *Abbott,* 498 P.2d at 720–22).

**26.** *Id.*

**27.** *See Indus. Indem. Co. v. State,* 669 P.2d 561, 563 (Alaska 1983) ("[C]ourts must not intrude into realms of policy exceeding their institutional competence."); *Johnson v. State,* 636 P.2d 47, 64 (Alaska 1981).

**28.** *Berkovitz v. United States,* 486 U.S. 531, 546, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

**29.** 490 P.2d 1206, 1210 (Alaska 1971).

**30.** *Id.* at 1208–09.

**31.** *Id.* at 1208.

**32.** *Id.*

**33.** 963 P.2d 1047, 1050–51 (Alaska 1998).

**34.** 894 P.2d 642, 646 (Alaska 1995).

**35.** 669 P.2d at 564–65.

**36.** 6 P.3d 250, 261–62 (Alaska 2000).

ed *Abbott's* holding that "[o]nce the initial policy determination is made ... decisions as to how that decision should be carried out ... [are] made at the operational level." [37] Search and rescues may fall into this category because before troopers decide whether to launch a search or a rescue, they must evaluate weather and safety conditions, determine if suitable resources are available, and generally weigh the risks against the benefits of a particular endeavor.

*Angnabooguk v. State, Department of Natural Resources*[38] is particularly helpful in categorizing search and rescue decisions. There, a fire burned out of control after the Division of Forestry allegedly set a remedial fire that the division did not have enough resources to contain. We held that there was no actionable statutory duty of care to fight the fire non-negligently.[39] We further held that the department's internal rules and guidelines did not create a duty of care.[40] We did hold, however, that the department owed a duty of care as a matter of public policy.[41] We relied on *City of Fairbanks v. Schaible*,[42] in which we held that when a fire department chooses to fight a particular fire, it must do so non-negligently.[43]

We went on to say in *Angnabooguk* that neither the Alaska Tort Claims Act nor our case law supported the department's contention that all firefighting decisions are protected by discretionary function immunity.[44] First, we observed that the plain language of the tort claims statute did address some specific activities and we concluded that had

the legislature intended to immunize all firefighting activities it could have said so in the statute.[45] Second, we noted that we had never held that an entire class of decisions was *"necessarily* bound up with policy considerations" sufficient to immunize all firefighting decisions.[46] After reviewing the entirety of our discretionary function immunity jurisprudence,[47] we reiterated the distinction between planning and operational decisions [48] and instructed the superior court on remand to determine for each alleged negligent act whether it was a planning or an operational decision.[49]

Just as we were not prepared in *Angnabooguk* to hold that all firefighting decisions are entitled to discretionary function immunity, we are not prepared in this case to say that every search and rescue decision is immune from tort claims. We hold here, however, that the initial decision in this case whether to launch a search and rescue effort is sufficiently based on resource allocation and public policy considerations that it is immune.

In reaching that conclusion, we find *Johnson v. United States, Department of Interior*[50] particularly instructive. In that case, a group of hikers climbing Buck Mountain in Grand Teton National Park lost contact with Johnson, a member of the group. One of the hikers notified park rangers that Johnson was missing. The park rangers did not initiate a climbing search and rescue until five hours after receiving the initial report that

37. *Id.* at 262 (quoting *Abbott*, 498 P.2d at 722).

38. 26 P.3d 447 (Alaska 2001).

39. *Id.* at 451–52.

40. *Id.* at 452.

41. *Id.* at 452–53.

42. 375 P.2d 201 (Alaska 1962).

43. *See also Adams v. City of Tenakee Springs*, 963 P.2d 1047, 1049 (Alaska 1998) (affirming superior court in case in which jury was instructed that city could not be held liable for resource allocation but could be held liable for negligent conduct).

44. 26 P.3d at 454–55.

45. *Id.*

46. *Id.* at 455 (original emphasis).

47. *Id.* at 456 n. 34.

48. *Id.* ("[T]he State's decision to engage in an activity is an immune 'planning' decision, while the decisions undertaken in implementing the activity are operational, as long as the implementation does not involve the consideration of policy factors.").

49. *Id.* at 458.

50. 949 F.2d 332 (10th Cir.1991).

Johnson was lost.[51] The rangers initiated a helicopter search early the next morning but Johnson had died of hypothermia the previous evening after sustaining injuries while descending the mountain.[52] The United States Court of Appeals for the Tenth Circuit reviewed the process by which the rangers made search and rescue decisions. It recognized that they "must act without reliance upon fixed or readily ascertainable standards when making a search and rescue decision in the field."[53] It then considered whether the rangers' search and rescue decisions "simply" involved weighing considerations under an "established program" or whether they involved "the balancing of competing policy considerations."[54] It observed that "[t]he discretionary function exception may apply in the absence of a conscious decision, so long as the . . . search and rescue program allowed room for the rangers to make independent policy judgments."[55] The court then held:

> the rangers' decision if, when or how to rescue inherently involves the balancing of safety objectives against such practical considerations as staffing, funding and minimizing government intrusion. As such, these decisions are grounded in social and economic policy, and thus are shielded from liability under the [Federal Tort Claims Act] discretionary function exception.[56]

Kiokun argues that the troopers' decisions whether and when to initiate a search and rescue are not discretionary. But we think that a decision whether to conduct a search and rescue is inherently a decision regarding public safety objectives and the allocation of resources.

The Wisconsin Supreme Court offers a different way to analyze search and rescues. It compares ministerial and discretionary activities and on a case-by-case inquiry applies a "known danger" exception to immunity.[57] The court explained:

> [A] dangerous situation will be held to give rise to a ministerial duty only when "there exists a known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgment and discretion."
>
> . . . .
>
> For the known danger exception to apply, the danger must be compelling enough that a self-evident, particularized, and non-discretionary municipal action is required. The focus is on the specific act the public officer or official is alleged to have negligently performed or omitted.[58]

*Lee v. State*[59] involved a particularized and non-discretionary trooper response to aid a girl whose arm was reported to be in the mouth of a lioness at a nearby amusement park. It is a graphic example of a "known danger" situation. The report identified a particularized threat, a victim already in extreme jeopardy and unlikely to be able to protect herself with her own resources, and a specific nearby location easily reached by the responding trooper. Given these circumstances, no conceivable discretion about whether to respond, when to respond, and where to go was involved. However, under Wisconsin's analysis, a report of the type received from the hunters cannot be classified as involving a "known danger" because the proper way to respond is not self-evident or non-discretionary. Judgment and discretion must be exercised in deciding what to do

---

51. *Id.* at 334–35.

52. *Id.*

53. *Id.* at 338.

54. *Id.* at 339.

55. *Id.*

56. *Id.* at 339; *see also Huber v. United States*, 838 F.2d 398, 401 (9th Cir.1988) (Coast Guard can decide whether to aid vessel); *In re Am. Oil Co.*, 417 F.2d 164, 168 (5th Cir.1969) (Coast Guard's search and rescue plan imposed no duty on government to public).

57. *Lodl v. Progressive N. Ins. Co.*, 253 Wis.2d 323, 646 N.W.2d 314, 323–24 (2002); *see also Hoskins v. Dodge County*, 251 Wis.2d 276, 642 N.W.2d 213, 219–20 (App.2002).

58. *Lodl*, 646 N.W.2d at 324 (quoting *C.L. v. Olson*, 143 Wis.2d 701, 422 N.W.2d 614 (1988)).

59. 490 P.2d 1206 (Alaska 1971).

and how to do it in response to that sort of report.

In this case, the troopers received information about the Olruns and formulated a response based on weather conditions, accessibility of resources, and availability of manpower. The hunters found the Olruns' car at Mile 50 on the unmaintained Denali Highway, eighty miles from Cantwell and fifty miles from Paxson. The car was also eight miles from the Maclaren River Lodge and a mile and a half from Moore's Camp. After the hunters found the car, it took them about two hours and fifteen minutes to reach the Cantwell trooper post. The hunters did not know how long the car had been abandoned when they found it, but because they saw footprints and an arrow and "HELP" sign stamped in the snow, they reported that there were people in trouble. It was forty-five degrees below zero Fahrenheit the evening of January 15. The troopers did not know how the Olruns were dressed or what provisions they had with them. The extreme temperatures made aircraft searches or ground travel difficult or impossible.

We asked the parties for supplemental briefing on the issue of what decisions were made by the troopers and when.[60] Trooper Heck made the decision sometime between 6:25 p.m. and 7:20 p.m. on January 15 that it was too cold and dark to proceed with rescue efforts that night, over an hour after the troopers received the hunters' report. Because the hunters had to drive about two hours to reach the Cantwell post, Trooper Heck made his decision more than three hours after the hunters left the abandoned vehicle. Kiokun's expert, an arctic engineer and "specialist in frost formation in Alaska weather" testified that the Olruns likely left their vehicle around 1:30 p.m. on January 15. This was perhaps six hours before Trooper Heck made his initial decision. Trooper Heck determined that it was likely that the Olruns could walk the eight miles to the lodge by the time anyone could reach them and that resources were better spent in the morning. Although the record establishes that Trooper Heck was later disciplined by the Department of Public Safety for failing to take further measures, for purposes of our discretionary function immunity inquiry, it was within the department's discretion for Trooper Heck to make his decision. In personal injury actions against the state, the issue of negligence arises only if the conduct at issue involves performance of an operational function and thus falls outside the protection of discretionary function immunity; by contrast, because sovereign immunity does not constrain a state agency's actions, the department may impose discipline for negligent breaches of its standards of conduct regardless of whether those breaches involve discretionary functions.[61]

■ We conclude that the evaluation of weather conditions and resource availability is better left to the immediate discretion and expertise of the Department of Public Safety than evaluated in retrospect by the courts.[62] We hold that the decision whether to initiate a search and rescue operation remains one of policy. Some, although not necessarily all, decisions made after a search and rescue is commenced may be operational.[63]

■ We have said that if the state has breached a statute or regulation expressly requiring it to act under specific circumstances, its decisions are not protected by

60. In their supplemental briefing, both parties referred to the administrative investigation report. The department objected on the grounds that the report was not admitted into "record evidence." After considering the department's objections, we believe the report contains helpful information, and we have relied on it in discussing some details of the troopers' activities.

61. *Kooly v. State*, 958 P.2d 1106, 1108 (Alaska 1998).

62. *See Sanders*, 944 P.2d at 458–59 ("Because the governing regulation provides no standards

that a court might use to analyze the non-enforcement decision, the non-enforcement decision is protected by the discretionary function exception in AS 09.50.250(1).").

63. *Cf. Angnabooguk*, 26 P.3d at 459 ("[C]ertain on-the-scene firefighting tactical decisions may be considered discretionary because they entail resource allocation decisions or considered decisions of firefighting policy that are properly vested in the officials in charge.").

discretionary function immunity.[64] Kiokun argues that the troopers had a mandatory duty to go to the Olruns' aid under AS 44.41.020, which provides that "[t]he Department of Public Safety shall administer functions relative to the protection of life and property." The department responds that AS 18.60.120 controls searches and rescues. Alaska Statute 18.60.120 states:

> Upon being notified that a person is lost, injured, killed, or is in need of immediate rescue, the commissioner of public safety or a designee may appoint a competent person to organize, direct, and guide a search and rescue party for the purpose of rescuing or retrieving the person of the person's remains.

We read these two statutes as authorizing the state to conduct search and rescue operations. We do not read them as imposing a mandatory duty which would be enforceable in the abstract regardless of the circumstances in a given situation. The state's duty necessarily turns on the circumstances presented. This duty squarely implicates the same resource allocation and risk-benefit considerations best left to the persons who must decide what to do when troopers receive a report like the one the hunters made.

We similarly do not read the department's operations manual to impose an actionable duty. The state's arguable failure to adhere to the manual consequently does not prevent it from invoking the discretionary function immunity defense.

## IV. CONCLUSION

Because the troopers' decision whether to initiate a search and rescue was protected from a tort claim by discretionary function immunity, we REVERSE the judgment, VACATE the jury verdict and damages award, and REMAND for entry of judgment for the state.