*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SUNNY HAIGHT, Personal Representative of the Estate of SAVANNAH CAYCE, | Supreme Court No. S-16903 |
| Appellant, | Superior Court No. 1JU-14-00706 CI |
| v. | O P I N I O N |
| CITY & BOROUGH OF JUNEAU, | No. 7406 – September 6, 2019 |
| Appellee. | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Mark Choate, Choate Law Firm LLC, Juneau, for Appellant. Lael A. Harrison, Faulkner Banfield, P.C., Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers Maassen, and Carney, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A minor died in a motorized watercraft accident on a lake managed in part by a municipality. The minor's mother sued, claiming that the municipality negligently failed to take measures to ensure safe operation of motorized watercraft on the lake. The municipality sought summary judgment based on discretionary function immunity,

which the superior court granted.  Because the superior court correctly applied the doctrine of discretionary function immunity, we affirm its decision.

## II.     FACTS AND PROCEEDINGS

### A.      Facts

Auke Lake sits within the City and Borough of Juneau.  The State owns the lake but shares management authority with the City.  State law at the relevant time allowed motorized watercraft on the lake as long as they did not degrade or damage the lake or its surroundings.[1]  A State land use plan also covered the lake, but the plan did not appear to regulate watercraft use.[2]  Like the State's land use plan, the City's comprehensive land use plan required only that the lake be managed to preserve the area's natural features.[3]  The City did not have a separate land use plan for the lake.

In 2006 the State took the position that "conflicts between lake users, property owners and residents are properly addressed through local government control and enforcement." In 2007 the City passed an ordinance governing motorized watercraft use on the lake, restricting areas and hours of operation, size, and wake height.  The ordinance did not impose speed limits, horsepower limits, or traffic patterns, although the City received comments and testimony urging that the ordinance do so.

In 2009 the City's planning department recommended replacing a gravel boat launch near the lake's outlet with  a concrete launch near a visitor parking lot.  The

---

[1]     11 Alaska Administrative Code 96.020(a)(1)(F) (2008).

[2]     JUNEAU STATE LAND PLAN, ALASKA DEP'T OF NAT. RES., DIV. OF LAND RES. ASSESSMENTS & DEV. (1993), dnr.alaska.gov/mlw/planning/areaplans/juneau/pdf/juneau_state_lan.pdf.

[3]     COMPREHENSIVE PLAN, CITY & BOROUGH OF JUNEAU, CMTY. DEV. DEP'T 141-57 (Oct. 20, 2008), www.juneau.org/cddftp/documents/CompPlan2008_Chapter10.pdf.

accompanying report acknowledged comments urging the department to consider possible increased motorized watercraft use and accompanying safety concerns, but the report stated that the City assembly would have to enact an ordinance to address public safety issues created by any additional traffic. The recommendation was approved, and the new boat launch was completed in 2011.

In June 2012 teenager Savannah Cayce and a friend were riding in an inflatable raft pulled by a motorized watercraft on the lake. The operator, Robert Herring, later stated that he was traveling about 40 to 45 miles per hour. Shawn Miller was operating another motorized watercraft nearby, making "deep, quick turns to try and roll" it. Herring turned his watercraft, causing the inflatable raft carrying Cayce to swing into Miller's watercraft. Cayce suffered a serious head injury and died two days later.

## B.     Proceedings

Cayce's mother, Sunny Haight, as personal representative of Cayce's estate, sued the City, Herring, and Miller for negligence, seeking damages for Cayce's suffering and wrongful death. Haight contended that the City owed a duty of care to lake users and that it breached its duty by failing to take adequate measures to reduce safety hazards created by motorized watercraft. She asserted that the City should have established a speed limit, a horsepower limit, and traffic patterns for motorized watercraft and should have posted warning signs regarding safe use of the lake. The City sought summary judgment based on discretionary function immunity, which bars claims for damages against municipalities for acts and omissions falling within discretionary governmental functions.[4] The superior court granted the City summary judgment, reasoning that

---

[4]     *See* AS 09.65.070(d)(2) ("An action for damages may not be brought against a municipality or any of its agents, officers, or employees if the claim . . . is based upon the exercise or performance or the failure to exercise or perform a discretionary (continued...)

whether to take the measures Haight suggested was a policy decision to be made by the City assembly and that such a policy decision was protected by discretionary function immunity.

Haight appeals.

## III.   STANDARD OF REVIEW

"We review a grant of summary judgment de novo, 'affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.' "[5]  "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[6]

## IV.   DISCUSSION

### A.   Overview Of Discretionary Function Immunity

Alaska law generally allows damages claims against municipalities, but the law bars claims for damages "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees."[7]  A companion statute waives the State's sovereign immunity except for claims involving discretionary functions.[8]  We have adopted the "planning-operational test" to distinguish decisions that are protected by discretionary function

---

[4]   (...continued)
function . . . .").

[5]   *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012) (quoting *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008)).

[6]   *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[7]   AS 09.65.070(d)(2).

[8]   AS 09.50.250(1).

immunity from those that are not.[9] We have articulated the test as follows:

> Under the "planning-operational" test . . . decisions that rise to the level of planning or policy formulation will be considered discretionary acts which are immune from tort liability, whereas decisions that are merely operational in nature, thereby implementing policy decisions, will not be considered discretionary and therefore will not be shielded from liability.[10]

This test is somewhat imprecise;[11] "almost any act, even driving a nail, involves some 'discretion,' "[12] and we have stated that decisions made while implementing a planning decision are not necessarily unprotected operational decisions.[13] Whether a decision is planning or operational depends on the particular circumstances.[14]

"We look to the purposes underlying discretionary function immunity" to

---

[9] *Japan Air Lines Co. v. State*, 628 P.2d 934, 936 (Alaska 1981).

[10] *Id*.

[11] *Guerrero ex rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 977 (Alaska 2005) ("[T]he dividing line between planning and operational decisions may often be hard to discern . . . ."); *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982) ("We recognize that this 'planning level-operational level' test is somewhat inexact.").

[12] *State v. Abbott*, 498 P.2d 712, 720 (Alaska 1972).

[13] *See Kiokun v. State, Dep't of Pub. Safety*, 74 P.3d 209, 218 (Alaska 2003) ("[T]he decision whether to initiate a search and rescue operation remains one of policy. Some, although not necessarily all, decisions made after a search and rescue is commenced may be operational."); *Guerrero*, 123 P.3d at 977 ("[T]he department's undeniable duty to act safely did not automatically shift all of its post-undertaking decisions to the operational side of the planning/operational dichotomy.").

[14] *Guerrero*, 123 P.3d at 978 ("[T]he determination turns on the nature of the specific decision at issue.").

guide our application of the planning-operational test.[15] "Discretionary function immunity 'preserve[s] the separation of powers' " by guarding against judicial intrusion on the policy-making powers committed to the legislative and executive branches;[16] these powers include assessing the costs and benefits of a proposed course of action, budgeting, and distributing scarce government resources.[17] Because policy questions such as where to allocate resources or which course of action to follow may arise after the initial planning decision is made, we distinguish between decisions involving " 'formulation of basic policy' including consideration of financial, political, economic, or social effects of the policy" and those involving "[n]ormal day-by-day operations of the government."[18] The former are protected planning decisions; the latter are unprotected operational decisions.[19] In other words, the planning-operational test requires courts to "isolate those decisions sufficiently sensitive" to separation of powers concerns and "protect those decisions worthy of protection without extending the cloak

---

[15]     *Id.* at 976.

[16]     *Id.* (quoting *Estate of Arrowwood ex rel. Loeb v. State*, 894 P.2d 642, 645 (Alaska 1995)).

[17]     *Id*. at 977; *Freeman v. State*, 705 P.2d 918, 920 (Alaska 1985) (holding decision not to institute dust-control measures on Dalton Highway was immune because it was based on cost-benefit calculation "involving such basic policy factors as the cost of such a program, alternative uses for the money that would be needed for such a program, and the physical and environmental detriments which would be inherent in the several dust control alternatives under consideration"); *Indus. Indem. Co. v. State*, 669 P.2d 561, 564-65 (Alaska 1983) ("Decisions regarding the allocation of scarce resources are usually discretionary, and thus immune from judicial inquiry.").

[18]     *Steward v. State*, 322 P.3d 860, 863 (Alaska 2014) (first quoting *Estate of Arrowwood*, 894 P.2d at 644-45; then quoting *Abbott*, 498 P.2d at 720).

[19]     *Id.*

of immunity to an unwise extent."[20]

Discretionary function immunity similarly prevents the judicial branch from adjudicating the soundness of policy decisions that it lacks the institutional capacity to make.[21] And discretionary function immunity protects public resources against unforeseeable and overwhelming liability that might result from making governmental policy decisions generally subject to damages.[22]

Again, whether a decision is planning or operational depends on the particular circumstances. At one end of the spectrum, we consistently have held that when the government does not have an affirmative duty to act, it cannot be held liable for the decision not to act.[23] We have held that, absent a plan or regulation dictating

---

[20]    *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982).

[21]    *Guerrero*, 123 P.3d at 976-77 ("As we have acknowledged, '[t]he judicial branch lacks the fact-finding ability of the legislature and the special expertise of the executive departments.' " (alteration in original) (quoting *Indus. Indem. Co.*, 669 P.2d at 563)).

[22]    *Id*. at 977.

[23]    *See Indus. Indem. Co.*, 669 P.2d at 566 ("[O]nce it is determined that the decision at issue is of the type entrusted to the planning level of government, a claimant must show that an affirmative assumption of duty has been made by the state in order to have a claim for relief for alleged operational negligence in performing that duty."); *Jennings v. State*, 566 P.2d 1304, 1311 n.28, 1312 (Alaska 1977) (holding that State's decision not to lower speed limit at location where child was struck crossing road was protected because location was not within school zone, which would have mandated lower speed limit).

We note that the presence of an affirmative duty does not necessarily mean all actions taken pursuant to that duty are unprotected. For example, in *Freeman v. State* we held that the State's assumption of the duty to maintain the Dalton Highway did not mean its decision not to institute dust-control measures was unprotected, because that decision involved policy considerations about cost and environmental effects. 705 P.2d
(continued...)

otherwise, decisions not to install safety devices such as highway guardrails or sequential traffic lights at specific locations are protected planning decisions.[24] The decision not to act is protected because limited budgets entail tradeoffs between competing needs — decisions involving basic policy considerations — and because allowing fault for every instance in which the government does not act might result in unpredictable and unforeseeable damages liability.[25]

At the other end of the spectrum, we have held that when a planning decision has been made to follow a particular course of action, decisions carrying out that course of action and governed by design standards are unprotected operational

---

[23]    (...continued)
918, 920 (Alaska 1985). The important distinction is that absent an affirmative duty, the failure to act is protected.

[24]    *See Indus. Indem. Co.*, 669 P.2d at 563 ("[T]he question of whether or not to install a guardrail . . . was one of policy, and . . . an affirmative decision to go ahead with the installation had to be made at the discretionary level in order to advance the chain of events to the operational stage." (footnote omitted)); *Wells v. State*, 46 P.3d 967, 969 (Alaska 2002) ("[U]nder this court's precedent, the State is immune from suits for claims based on its decision to install or not install guardrails."); *Wainscott*, 642 P.2d at 1357 (holding that decision not to install sequential traffic light at intersection was planning decision because placement of traffic safety devices depended on priorities set by Department of Transportation and safety engineers); *Rapp v. State*, 648 P.2d 110, 110-11 (Alaska 1982) (applying *Wainscott* to decision to install stop sign instead of sequential traffic light).

[25]    *See Indus. Indem. Co.*, 669 P.2d at 565-66 ("[A] decision by the state to place guardrails along the Glenn Highway would necessarily affect the state's ability to provide other governmental services. We would be engaging in precisely the type of policy evaluation that the discretionary function exception is designed to foreclose if we were to inquire into the wisdom of the state's guardrail policy in this case. . . . We do not think that a decision by the Department to fund only a portion of a proposed project renders the state vulnerable to lawsuits with respect to every proposal not carried out.").

decisions.[26]  Such decisions are unprotected because they do not involve policy judgments and because reviewing the government's adherence to standards falls within the traditional competence of the courts.[27]

## B.  The Decision Not To Regulate Or Mitigate Safety Concerns About The Lake

Haight appeals the superior court's ruling that the City's decision not to regulate safety on the lake was protected by discretionary function immunity.  She concedes that building a new boat launch was a protected planning decision.  But, contending that the new boat launch created safety hazards on the lake, she argues that whether to mitigate those safety hazards was part of the planning decision implementation and therefore was an unprotected operational decision.

Haight first cites *State, Department of Transportation & Public Facilities v. Sanders*[28] for the proposition that discretionary function immunity does not protect decisions relating to safety hazards created by a planning decision.  In *Sanders* a motorcyclist sued the State for injuries sustained when he collided with a baggage train

---

[26]     *See Japan Air Lines Co. v. State*, 628 P.2d 934, 936, 938 (Alaska 1981) (holding State liable for construction of airport taxiway narrower than width prescribed by federal design standards); *Guerrero*, 123 P.3d at 978 ("[O]ur cases indicate that discretionary function immunity would bar the claim unless the project at issue . . . was governed by clearly established standards that mandated . . . installation [of specific traffic control devices].").

[27]     *See State v. I'Anson*, 529 P.2d 188, 194 (Alaska 1974) ("[R]esolution of questions such as whether or not the state properly striped or marked a portion of highway as it relates to the state's duty of care . . . presents facts that courts are equipped to evaluate within traditional judicial fact-finding and decision-making processes.").

[28]     944 P.2d 453 (Alaska 1997).

using a public road near the Anchorage International Airport.[29]  Airport officials had allowed baggage trains to regularly use the road even though the trains did not comply with Department of Public Safety road vehicle regulations.[30]  But the Department, as the entity charged with overseeing airports, had promulgated another regulation granting airport officials discretion whether to enforce vehicle regulations.[31]  We stated:

> [T]he discretionary function exception protects the planning decision to allow aircraft support vehicles to use [the road], but it does not protect the manner in which [a]irport officials implement that decision.  In this case, if those officials did not take reasonable steps to implement the planning decision in a non-negligent manner, the State may be liable.[32]

Relying on *Guerrero ex rel. Guerrero v. Alaska Housing Finance Corp.*,[33] Haight also argues that the City could have posted signs near the new boat launch warning of the lake's dangers and that its decision not to do so thus was an unprotected operational decision.  In *Guerrero* the parents of a child struck by a car while crossing a street sued the State, arguing that implementing safety measures such as an overpass, traffic lights, and warning signs was an unprotected operational decision carrying out the planning decision to construct the thoroughfare.[34]  We stated that not every decision following from the initial decision to undertake a project is necessarily operational and explained that a decision implementing a project is operational only when — at least

---

[29]     *Id.* at 455.

[30]     *Id*. at 455, 458.

[31]     *Id.* at 457.

[32]     *Id*. at 459 (footnotes omitted).

[33]     123 P.3d 966 (Alaska 2005).

[34]     *Id*. at 969, 977-78.

regarding traffic control measures — it is "governed by clearly established standards mandating" it.[35] We concluded that the decision not to install an overpass or traffic lights was not operational because doing so was not mandated by traffic safety standards adopted by the State and that the decision not to post warning signs was operational because relevant safety standards mandated such signs.[36] We observed that allowing liability for the latter decision did not implicate the purposes underlying discretionary function immunity: Posting required signs does not involve significant policy choices or the allocation of significant resources, and the standards, if followed, would not subject the State to unforeseeable or overwhelming liability.[37]

Although Haight argues that the decision not to regulate or to mitigate lake safety concerns was an unprotected decision implementing the decision to build the new boat launch, we conclude — as did the superior court — that not regulating lake safety was a planning decision protected by discretionary function immunity. Absent the assumption of an affirmative duty, the City may not be held liable for the decision not to act. Haight presented no evidence that the City had an affirmative duty to regulate lake safety; the State in fact did not require the City to regulate lake safety,[38] and the City's ordinances at the time of Cayce's death did not address lake safety. The City's

---

[35] *Id*. at 978.

[36] *Id*. at 979-80, 982.

[37] *Id*. at 982.

[38] JUNEAU STATE LAND PLAN, ALASKA DEP'T OF NAT. RES., DIV. OF LAND RES. ASSESSMENTS & DEV. (1993), dnr.alaska.gov/mlw/planning/areaplans/juneau/pdf/juneau_state_lan.pdf.

land use plans did not address lake safety,[39] and the report recommending construction of the new boat launch stated that an ordinance would be needed to regulate lake safety. And as the City notes, several safety measures Haight proposes were rejected when the assembly passed the 2007 ordinance.

Haight tries to avoid the absence of a statutory duty to regulate lake safety by relying on *Sanders* and framing lake safety hazards as resulting from implementing the decision to build the new boat launch. But the analogy to *Sanders* is inapposite. Our conclusion in *Sanders*, that the decision to allow baggage trains on roadways could not be negligently implemented, implicitly recognized an affirmative duty to ensure vehicle safety on the road.[40] There is no comparable regulation or duty in this case.

The decision not to regulate safety on the lake is akin to decisions not to install highway guardrails or sequential traffic lights at specific locations. Unless dictated by a plan or regulation, the decision not to act is fundamentally discretionary, as are its consequences, because scarce resources mean that not every possible course of action can be funded and because of the threat of unpredictable and overwhelming liability. As the City stresses, holding that the decision not to regulate watercraft safety

---

[39] COMPREHENSIVE PLAN, CITY & BOROUGH OF JUNEAU, CMTY. DEV. DEP'T 141-57 (Oct. 20, 2008), www.juneau.org/cddftp/documents/CompPlan2008_Chapter10. pdf.

[40] *See* 944 P.2d 453, 458 (Alaska 1997) ("[T]he State's practice of not enforcing vehicle safety regulations . . . is essentially a decision to open [the road] to aircraft support vehicles that do not comply with applicable vehicle safety regulations."). The circumstances in *Sanders* were unusual; the Department of Public Safety promulgated vehicle safety regulations, but it also allowed airport officials not to enforce them. *Id.* at 455. Given the regulations, it seems unlikely that the Department meant to allow airport officials to ignore vehicle safety on airport roads. Rather it seems that the Department meant to allow airport officials to use their judgment in ensuring vehicle safety, which might entail varying from the Department's regulations.

on the lake was an unprotected operational decision following from the decision to build a new boat launch would open the door to damages liability for the inevitable failure to address all of the potentially limitless and unforeseeable safety consequences occurring downstream from the decision to build the boat launch.

We also conclude that the decision not to mitigate lake safety would be protected even if, as Haight argues, that decision were part of implementing the decision to build the new boat launch. We previously have stated that not every decision implementing an initial planning decision is operational for purposes of discretionary function immunity.[41] We look instead at the purposes underlying immunity to determine whether a decision is planning or operational. The City persuasively argues that whether to take the kinds of safety measures Haight proposed was a planning decision because it involved basic policy considerations regarding allocation of scarce resources and which uses to allow. The decision not to take safety measures cannot be characterized as the kind made during the "normal day-by-day operations of the government" that we have concluded were unprotected operational decisions.[42] On this point Haight's analogy to *Guerrero* is also inapposite. We concluded in *Guerrero* that the State could be held liable for not posting warning signs because those signs specifically were mandated by safety standards the State adopted and were therefore operational.[43] In this case there are no regulations mandating that the City post signs or otherwise regulate lake safety.

---

[41] *See Kiokun v. State, Dep't of Pub. Safety*, 74 P.3d 209, 218 (Alaska 2003); *Guerrero*, 123 P.3d at 977 ("Some, although not necessarily all, decisions made after a search and rescue is commenced may be operational.").

[42] *See Steward v. State*, 322 P.3d 860, 863 (Alaska 2014) (quoting *State v. Abbott*, 498 P.2d 712, 720 (Alaska 1972)).

[43] *Guerrero*, 123 P.3d at 979-80.

## C.    Other Issues

Haight also claimed that the City breached its duty of care by failing to enforce "ordinances controlling use of motorized vessels" on the lake. Haight presumably was referring to the City's 2007 ordinance. But she neither pleaded nor presented any facts showing that the City had failed to enforce its 2007 ordinance or any other ordinance controlling watercraft use on the lake or that the failure to enforce any ordinances was a cause of the accident. Haight notes in her appeal brief that enforcement of ordinances was among other measures the City could have taken to reduce hazards on the lake. But her support is a portion of her brief opposing the City's motion for summary judgment, containing a conclusory assertion that Herring violated a State law prohibiting watercraft from towing devices in a negligent manner. To the extent Haight raised a viable claim against the City, we conclude that by inadequately briefing the issue, she has forfeited it on appeal.[44]

The City further argues that Haight impermissibly relies on an expert witness affidavit to identify reasonable safety measures the City could have taken. Because the City is entitled to summary judgment regardless of the affidavit, it is not necessary to reach this argument.

## V.    CONCLUSION

We AFFIRM the superior court's decision.

---

[44]    *See Kollander v. Kollander*, 400 P.3d 91, 94 n.3 (Alaska 2017) (holding arguments waived because appellant's brief "addresse[d] [them] only cursorily and d[id] not cite authority for either argument").