Alexander E. GUERRERO, a minor child, by his next friend and father, Cristian GUERRERO; Cristian Guerrero and Juana Guerrero, individually, Appellants,

v.

ALASKA HOUSING FINANCE CORPORATION and State of Alaska, Department of Transportation and Public Facilities, Appellees.

No. S–11024.

Supreme Court of Alaska.

Nov. 4, 2005.

---

**45.** *United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

Philip Paul Weidner, Weidner & Associates, Inc., Anchorage for Appellants.

David Karl Gross and Stephen H. Hutchings, Birch, Horton, Bittner and Cherot, Anchorage, for Appellee Alaska Housing Finance Corporation.

Venable Vermont, Jr., Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska, Department of Transportation and Public Facilities.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Alexander Guerrero was hit by a car as he crossed a busy street near a public housing complex where he and his family were living. His parents sued the Alaska Department of Transportation and Public Facilities (the department), which built and maintained the street, and the Alaska Housing Finance Corporation (the corporation), which owned and operated the housing complex. The Guerreros alleged negligent design, construction, maintenance, and failure to warn. The superior court dismissed the Guerreros' complaint for failing to state a viable claim, ruling that the department was immune and the corporation owed no duty to protect tenants from injury off-premises. We reversed and remanded for further proceedings, finding the complaint sufficient on its face to allege potentially viable claims against both defendants.[1]

On remand, the superior court allowed discovery to proceed but eventually granted summary judgment to both defendants, finding that the record revealed no grounds for requiring the corporation to protect Guerrero from off-premises danger, and no grounds for a viable claim against the department. We affirm as to the corporation, but reverse in part as to the department, holding that the record contains evidence that is at least minimally sufficient to show that the department

might have owed and breached an operational duty to post adequate warning signs.

## II. FACTS AND PROCEEDINGS

This is the second time this case has come before us. We summarized the relevant facts in the first appeal, *Guerrero v. Alaska Housing Finance Corporation, State of Alaska, Department of Public Transportation (Guerrero I )*:

Five-year-old Alexander Guerrero was hit by a car and severely injured as he attempted to cross C Street near its intersection with 22nd Avenue in Anchorage.[2] The section of C Street where the accident occurred is part of a traffic couplet on A and C Streets (the A/C Couplet)[1] that was built by the Alaska Department of Transportation and Public Facilities (the department). At the time of the accident, Alexander and his family lived at the Loussac Family Housing Complex (the Loussac Complex), a low-income housing project sponsored by the Alaska Housing Finance Corporation (the corporation), a public corporation within the Alaska Department of Revenue.[2] The Loussac Complex is directly adjacent to the accident scene, situated between A Street on the east, C Street on the west, 20th Avenue on the north, and 22nd Avenue on the south.

The Guerreros sued the department and the corporation, alleging negligence in the design, construction, and maintenance of the A/C Couplet and related pedestrian systems in the vicinity of C Street and 22nd Avenue as they relate to the occupants of the Loussac Complex. They also alleged that the corporation had a duty as a landlord to ensure

---

[1] The A/C traffic couplet consists of two multi-lane, one-way streets—A Street and C Street—that run in opposite directions and are designed to channel rush-hour traffic smoothly into and out of the downtown Anchorage area.

[2] See AS 18.56.020.

---

**1.** *See Guerrero v. Alaska Hous. Fin. Corp.,* 6 P.3d 250, 264 (Alaska 2000).

**2.** Guerrero is now quadriplegic.

that conditions on its property did not subject tenants to hazards on C Street.

The department and the corporation moved to dismiss under Alaska Civil Rule 12(b)(6). The department claimed discretionary function immunity under AS 09.50.250(1). The corporation argued, first, that its duty as a landlord did not extend beyond its property and, second, that it, too, was immune under the discretionary function statute.

. . . .

[T]he superior court granted the defendants' motions and dismissed the case under Alaska Civil Rule 12(b)(6), concluding that the amended complaint failed to state a claim upon which relief could be granted against the department or the corporation. The court ruled that the department was entitled to discretionary function immunity under AS 09.50.250(1) because "installing or not installing safety features in specific areas is precisely the type of decision the doctrine of sovereign immunity for discretionary acts is meant to protect." The court also ruled that the corporation had no duty to protect the Guerreros from traffic hazards, finding it "firmly established that the duty of safeguarding children against obvious dangers off a landlord's property does not fall on the landowner." [3]

The Guerreros appealed, and we reversed. We first determined that neither the department nor the corporation had shown beyond doubt that they owed Guerrero no duty of due care. We held that the department owed a generalized duty of due care to pedestrians, and that this duty does not vanish simply because "the crossing alleged in the complaint was unlawful." [4] We also observed that a dismissal against the corporation on the duty issue would not have been proper unless the only reasonable inference was that the corporation owed the Guerreros no duty whatsoever or owed a duty that was "clearly and vastly narrower in scope" than the duty the Guerreros asserted. [5] We noted that we had never ruled "that a landlord's duty cannot extend off-premises under certain circumstances" and that "the corporation acknowledge[d] that it owe[d] a general duty to protect its tenants from danger." [6] And we found that a determination of the scope of the corporation's duty would depend on, among other things, whether the corporation had "obstruct[ed] access to a safe pedestrian underpass at 19th Avenue and C Street," had "funneled pedestrians ... toward the intersection at 22nd Avenue and C Street," and whether the corporation had "undertake[n] off-site responsibilities," had "influenced the project's design or plans" or "retained a measure of influence or control over the adjoining roadway." [7] Because these questions could not be resolved on the basis of the complaint alone, we held the corporation had failed to establish that the scope of its duty to the Guerreros was "vastly narrower" than the duty the Guerreros asserted. [8]

We further held that the defendants had not established that the claims against them were barred by discretionary function immunity. We emphasized that "what qualifies [for discretionary function immunity] often depends more on the factual circumstances surrounding an agency's actions than it does on the actions' inherent nature." [9] And we pointed to the fact that where we have upheld orders of dismissal, "we based our ruling on an extensive factual record." [10] We observed that the superior court had dismissed the case at an early stage in the proceedings, when "the Guerreros [had] had no opportunity to present evidence establishing the specific facts of their case." [11] We concluded that the case should not have been

---

3. *Guerrero I*, 6 P.3d at 252–53.

4. *Id.* at 255.

5. *Id.* at 257 (quoting *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998)).

6. *Id.* at 256–57.

7. *Id.* at 257.

8. *Id.* at 257–58.

9. *Id.* at 261–62.

10. *Id.* at 260.

11. *Id.*

dismissed without discovery. Accordingly we reversed the superior court's dismissal against both the department and the corporation and remanded so that the Guerreros would have the opportunity to conduct discovery.[12]

After the parties conducted discovery on remand, the department and the corporation filed motions for summary judgment, again arguing that they should prevail because they owed the Guerreros no duty and were protected by discretionary function immunity. The superior court granted summary judgment to both defendants.

The Guerreros appeal.

## III. DISCUSSION

### A. Standard of Review

■ To prevail on a motion for summary judgment, the moving party must offer admissible evidence demonstrating that there are no disputed issues of material fact and "the moving party is entitled to a judgment as a matter of law."[13] Once the moving party has made a prima facie showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to "demonstrate that a genuine issue of fact exists to be litigated by showing that it can produce admissible evidence reasonably tending to dispute the movant's evidence."[14] Because the validity of a trial court's ruling on summary judgment presents questions of law, we review the court's ruling independently,[15] basing our review on the entire trial court record—" 'the affidavits, depositions, admissions, answers to interrogatories and similar material.' "[16] In considering these materials, we give "the non-moving party ... the benefit of all reasonable inferences which can be drawn from the proffered evidence."[17]

### B. The Corporation's Potential Liability

The Guerreros initially challenge the superior court's order granting summary judgment to the corporation. In issuing this order, the superior court found that nothing the corporation could have done would have prevented the harm. The court also found that the corporation's decision not to fence off the housing project or to warn tenants of the dangers posed by C Street traffic did not enhance those dangers. The court reasoned that Guerrero, upon leaving Loussac Manor, "would have ended up on the same public sidewalk faced with the same choice of whether to cross the street at the designated areas" regardless of any safety measures taken by the corporation. The court further noted that the location of the egress route did not "eject[ ] children ... into a busy street" but instead placed them on a public sidewalk that was separated from C Street by a guardrail. Given these circumstances, the court found that "[t]he well-worn path is not dangerous," and concluded that, even if the corporation owed a duty to protect its tenants' children from some off-site dangers, this duty was vastly narrower than the one asserted by the Guerreros and did not extend to protection from the dangers of C Street. The Guerreros challenge this ruling.

In *Guerrero I* we acknowledged that we had never "addressed the issues of whether or when a landlord might have a duty to protect or warn tenants about dangers occurring on land adjacent to the landlord's premises."[18] We noted that other jurisdictions are split on this issue:

[T]he traditional view—still the decided majority—weighs against imposing a duty to warn or otherwise protect tenants from

---

12. *Id.* at 263–64.

13. *Pub. Safety Employees Ass'n, Local 92 v. State*, 895 P.2d 980, 984 (Alaska 1995) (quoting *Dayhoff v. Temsco Helicopters, Inc.*, 848 P.2d 1367, 1369 (Alaska 1993)).

14. *Charles v. Interior Reg'l Hous. Auth.*, 55 P.3d 57, 59 (Alaska 2002).

15. *Snook v. Bowers*, 12 P.3d 771, 776 (Alaska 2000).

16. *Charles*, 55 P.3d at 59 (quoting *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1215 (Alaska 1991)).

17. *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995) (citing *Deal v. Kearney*, 851 P.2d 1353, 1361 (Alaska 1993)).

18. *Guerrero I*, 6 P.3d at 256.

dangers of traffic on adjacent streets over which the landlord has no right of possession, management, or control. But an emerging minority would impose a duty to protect or warn in some situations; these cases apply a standard of reasonable care under the totality of the circumstances that considers possession, management, and control over conditions at the accident site to be relevant factors but does not make their absence dispositive as a matter of law.[19]

As in *Guerrero I*, we find it unnecessary here to resolve the general issue of off-site liability. Even if landlords have a duty to protect their tenants from some off-site dangers, we think that the record does not support the Guerreros' claim that the corporation had a duty to protect them from the dangers alleged in this case.

A number of courts have held that, under certain circumstances, a landlord may have a duty to protect tenants from off-site dangers. In *Udy v. Calvary Corporation*,[20] a small child was severely injured when he chased a basketball into a major street that was immediately adjacent to his backyard.[21] Before renting the space for their mobile home, the parents had asked the landlord whether the road adjacent to the space experienced heavy traffic and indicated that, if so, they would not be interested in renting the space.[22] The landlord assured the parents that there had never been any problems "as a result of the space's close proximity to" the busy street.[23] The parents rented the space only to discover that traffic was much worse than they had been led to expect. They repeatedly asked for permission to build a fence around their yard, but their landlord repeatedly denied

these requests.[24] The landlord argued that he had "no duty to protect a tenant from dangers located outside the premises."[25] The Arizona Court of Appeals disagreed, ruling that "a landlord's duty to his tenants is not as a matter of law circumscribed by the physical boundaries of the landlord's property."[26] The court broadly stated that a landlord must "take such precautions for the tenants' safety as a reasonably prudent person would take under similar circumstances in light of the known and foreseeable risks."[27] But it also carefully narrowed its decision. The landlord in the case had conceded that the absence of a fence was a proximate cause of the accident; the court tailored its ruling to this concession: "Harm that is caused, in whole or in part, by an activity or condition on particular premises cannot be viewed as unforeseeable as a matter of law merely because it happens to manifest itself beyond the property line."[28]

In *Barnes v. Black*,[29] a private sidewalk connected the children's play area of an apartment complex with the apartment buildings; the sidewalk adjoined a driveway that sloped steeply downward to a busy street.[30] While riding his "big wheel" tricycle along the sidewalk, a child lost control and rolled down the steep driveway into busy traffic on the street below, where he was struck by a car and killed.[31] The defendant landlord argued that he had no duty to protect his tenants from "unreasonable risk of injury off the premises on a public street over which [he] ha[d] no control."[32] On appeal from an order granting the landlord summary judgment, the California Court of Appeal rejected this argument, concluding that "the duty of care encompasses a duty to avoid exposing

19. *Id.*

20. 162 Ariz. 7, 780 P.2d 1055 (App.1989).

21. *Id.* at 1058.

22. *Id.* at 1057.

23. *Id.*

24. *Id.*

25. *Id.* at 1059.

26. *Id.* at 1061.

27. *Id.* at 1060.

28. *Id.* at 1059.

29. 71 Cal.App.4th 1473, 84 Cal.Rptr.2d 634 (Cal. App.1999).

30. *Id.* at 1476, 84 Cal.Rptr.2d 634.

31. *Id.*

32. *Id.* at 1478, 84 Cal.Rptr.2d 634.

persons to risks of injury that occur off site if the landowner's property is maintained in such a manner as to expose persons to an unreasonable risk of injury offsite." [33] In so concluding, the court distinguished an earlier California decision declining to hold the landlord liable after a child wandered from an apartment building into an adjacent street and was hit by a car.[34] Describing the earlier case, the *Barnes* court emphasized that its facts established "no close connection between the defendant's conduct and the child's injuries" [35]—a circumstance that the *Barnes* court viewed as disfavoring an off-site duty.[36] Considering the circumstances of its own case, the *Barnes* court found a significant difference, observing that conditions on the landlord's property—the configuration of the private sidewalk and the driveway—had directly contributed to the accident by causing the child to be ejected into the public street.[37] *Barnes* thus reversed the trial court's order of dismissal.[38]

■ These cases and other similar decisions [39] highlight several useful factors to consider in deciding if an off-site duty arose here: (1) whether the hazard was immediately adjacent to the corporation's property; (2) whether the corporation had any right or ability to control or abate the off-site hazard; (3) whether that hazard was as open and obvious to the project's tenant as it was to the corporation; and (4) whether any activity or condition on the corporation's property contributed to the accident or enhanced the adjacent danger.

The superior court found that the corporation's failure to take protective measures did not cause or enhance the hazard presented by C Street. The court emphasized the corporation's uncontradicted evidence that the existing fence on the north side of the apartments did nothing to obstruct access to the underpass at 19th Avenue and C Street. Noting that the Guerreros had acknowledged that the corporation was obliged to give them access to C Street, the court also found that there appeared to be nothing the corporation could have done to prevent them from "end[ing] up on the same public sidewalk faced with the same choice of whether to cross the street at the designated areas or not." The court accordingly ruled that even if the corporation had some off-site duty, the evidence showed that the corporation did not owe the Guerreros the duty at issue—to protect them from the dangers of C Street traffic.

■ We agree. The Guerreros undeniably offered considerable evidence indicating that the corporation knew that children living in the project could easily cross C Street and that crossing the street would be dangerous even for adults. This evidence might reasonably suggest that it was foreseeable that a child from the project might be seriously injured when attempting to cross C Street. But Guerrero cites no cases holding that a landlord's duty to protect tenants from off-premises injury can be triggered by mere awareness of obvious danger and foreseeable harm. To the contrary, as we have seen, the

33. *Id.*

34. *Id.* at 1479, 84 Cal.Rptr.2d 634 (citing *Brooks v. Eugene Burger Mgmt. Corp.,* 215 Cal.App.3d 1611, 1624, 264 Cal.Rptr. 756 (Cal.App.1989)).

35. *Id.*

36. *Id.*

37. *Id.*

38. *Id.* at 1480, 84 Cal.Rptr.2d 634.

39. *See Greenslade v. Mohawk Park,* 59 Mass.App. Ct. 850, 798 N.E.2d 336 (2003) (holding that the owner of a campground had no duty to warn guests of the dangers of a rope swing located on

adjacent property because the dangers presented by swinging from the rope and dropping into a river below were open and obvious); *Berman v. LaRose,* 16 Mich.App. 55, 167 N.W.2d 471, 472 (1969) ("[T]here is no duty, absent a statute, of an abutting owner as to the condition of the sidewalk or public way, unless the landowner has physically intruded upon the area in some manner or has done some act which either increased the existent hazard or created a new hazard."); *Limberhand v. Big Ditch Co.,* 218 Mont. 132, 706 P.2d 491, 499 (1985) (holding that "[i]f the instrumentality causing harm is located adjacent to the landowner's property, and the instrumentality poses a clear and foreseeable danger to persons properly using the landowner's premises, we see no reason to shield the landowner from liability as a matter of law. A duty to take some reasonable precautions may exist.").

case law illustrates that something more has invariably been required to hold landlords liable for off-site harm.

The Guerreros maintain that the unfenced, well-worn path leading toward the intersection of 22nd Avenue and C Street contributed to the danger and established the needed additional factor. But the superior court squarely addressed and rejected this contention. The court noted that the uphill path did not eject tenants into immediate danger; instead, it deposited them on a public sidewalk. There they were protected from traffic by a guardrail that separated the sidewalk from C Street; moreover, the sidewalk and guardrail ran continuously along the west side of the Loussac Manor property, so tenants could readily gain access to the sidewalk from other areas of the project—in fact, the corporation had a duty to make C Street accessible to its tenants. Given these circumstances, the superior court could properly find that the well-worn path did not expose tenants to any increased risk from the dangers of traffic passing by on the far side of the guardrail.

Nor does the record reveal any circumstances indicating that the corporation was in a better position than its tenants to know about the open and obvious dangers of C Street traffic, or that it had any special ability or right to control or abate any hazard at the intersection of 22nd Avenue and C Street. Because we see no basis for recognizing an off-site landlord duty in the undisputed circumstances presented here, we affirm the superior court's order granting summary judgment to the corporation.

### C. The Department's Potential Liability

In *Guerrero I* we ruled that the Guerreros asserted a potentially viable negligence claim based on their allegations that the department breached its duty to protect pedestrians from unreasonable danger posed by traffic at the intersection of C Street and 22nd Avenue.[40] The Guerreros based this claim largely on allegations of negligent design, construction, and maintenance of the A/C traffic couplet and related pedestrian systems in the vicinity of C Street and 22nd Avenue.[41] After a period of discovery on remand after *Guerrero I*, the department moved for summary judgment on several grounds, arguing that it had no duty to take the specific actions the Guerreros sought (actions including the placement of warning signs, signals, and/or a crosswalk or pedestrian overpass at C Street and 22nd Avenue); that liability for such actions was barred by discretionary function immunity in any event; and that the undisputed facts of the case simply made some of the Guerreros' specific theories of liability irrelevant. The superior court granted the department's motion summarily, without specifying the grounds for its ruling.

The Guerreros challenge the superior court's summary judgment order, insisting that the record raises triable issues of fact to support their claim against the department. In response, the department reasserts the arguments it raised below. "When a trial court grants summary judgment without stating its reasons," we "presume[ ] that the court ruled in the movant's favor on all of the grounds stated. Accordingly, the summary judgment should be reversed only if no ground asserted supports the trial court's decision."[42]

### 1. Duty

The department asserts initially that our decision in *Walden v. Department of Transportation*[43] compels the conclusion that the department did not owe the Guerreros a duty to install warning signs or markings on C Street. Asserting that *Walden* "embodies the more modern 'duty before immunity' analysis," the department urges us to hold that "[t]he Guerreros' failure to recognize the priority of duty analysis, and to discuss in any manner the controlling statutes for signing, marking and signaling, is fatal to their

---

40. *Guerrero I*, 6 P.3d at 264.

41. *Id.* at 253.

42. *Reed v. Municipality of Anchorage*, 741 P.2d 1181, 1184 (Alaska 1987).

43. 27 P.3d 297 (Alaska 2001).

signing and marking claims." But the department's duty argument overstates our holding in *Walden*.

Here, as in *Guerrero I*,[44] it seems appropriate to start by taking stock of our holding in *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*.[45] In *Arctic Tug* we noted that our cases draw a distinction between questions concerning precisely how far a duty extends and questions concerning the duty's general existence.[46] We noted that a threshold inquiry into duty is reserved for the second category of questions—those concerning the existence of a general duty.[47] We expressly observed that our law disfavors summary adjudication for the first category of questions—those concerning "the precise scope of that duty, or of whether particular conduct did or did not breach it."[48] And we emphasized that summary judgment is inappropriate on these narrower duty questions unless "the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever—or owed a duty clearly and vastly narrower in scope than the one that the other party asserts in opposing summary judgment."[49]

Viewed in perspective, our decision in *Walden* simply illustrates *Arctic Tug's* point concerning the limited circumstances under which narrow duty questions may properly be decided summarily. In *Walden*, a car slid off the highway on an icy curve, and one of its passengers, a child, was injured; Walden, the child's mother, sued the department, claiming negligence in failing to sand the road properly and in "failing to post a warning sign at the curve."[50] She based her warning-sign claim entirely on the theory that the *Manual on Uniform Traffic Control Devices* (*Traffic Manual*) would have called for a warning sign to be placed at the curve where the accident occurred. But the theory turned out to be unfounded. At the summary judgment hearing, the state's expert applied the *Traffic Manual's* technical standards for placing warning signs on curves and calculated that they would not have required or recommended a sign at the accident site, but would merely have *permitted* one. Walden's own expert then performed the same calculations and agreed with the department's conclusion. Walden offered no other factual theory to support her warning-sign negligence claim, so the superior court, seeing nothing left of the claim, granted summary judgment.

We affirmed on appeal. As the department correctly observes here, we ruled on the basis of duty, concluding that Walden had failed to establish that the department had a duty to install a warning sign. But in *Walden* the state's general duty of due care toward the injured child was not contested, and we simply concluded, as did the trial court, that Walden had no factual basis to support her warning-sign claim, so that in those circumstances, the exercise of reasonable care did not impose a duty on the state to post a sign at the accident. In keeping with *Arctic Tug*, *Walden* merely recognized that summary judgment was proper as to the specific scope of the duty because the undisputed facts conclusively showed that the plaintiff's sole theory of duty had no factual merit. Nothing in *Walden* suggests that all warning-sign claims or signage claims pose broad questions concerning the existence of a general duty.

As we expressly recognized in *Guerrero I*, the state does owe a general duty toward pedestrians who cross public roadways, and the existence of that duty here does not turn on the particularized facts of this case.[51] The only duty questions left open by *Guerrero I* are fact-specific questions relating to scope. At the summary judgment stage, the "vastly narrower" test set out by *Arctic Tug* governs such questions. Because this standard overlaps the

44. *Guerrero I*, 6 P.3d at 257.

45. 956 P.2d 1199 (Alaska 1998).

46. *Id.* at 1203.

47. *Id.*

48. *Id.*

49. *Id.*

50. *Walden*, 27 P.3d at 300.

51. *Guerrero I*, 6 P.3d at 255.

demanding summary judgment test we usually apply in reviewing the sufficiency of evidence to show possible negligence,[52] we see no need to undertake a preliminary, "more modern" analysis of the department's general duty toward the pedestrians.

## 2. Immunity

■ The department next claims that the Guerreros' action is barred by sovereign immunity. Like the federal government, Alaska has enacted a statutory waiver of sovereign immunity.[53] Although this waiver allows the state to be sued for claims arising in tort, it protects the state from suit when the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."[54] Not all acts that involve discretion or judgment are immune, for "almost any act, even driving a nail, involves some 'discretion.'"[55] In determining whether an act falls within the discretionary function exception, we distinguish between decisions that involve basic planning or policy and those that are merely operational in the sense that they implement plans or carry out policy.[56] The state retains immunity for the former but not for the latter.[57] Once the state has made a planning-level decision to undertake a project, it does not have discretion to implement that decision negligently.[58]

We look to the purposes underlying discretionary function immunity when deciding whether a particular decision is immune.[59] Discretionary function immunity "preserve[s] the separation of powers inherent to our form of government by recognizing that it is the function of the state, and not the courts or private citizens, to govern."[60] We have indicated that on basic matters of policy the courts should "refrain from second-guessing the legislative and executive branches."[61] Discretionary function immunity also prevents courts from "intrud[ing] into realms of policy exceeding their institutional competence."[62] As we have acknowledged, "[t]he judicial branch lacks the fact-finding ability of the legislature and the special expertise of

**52.** *See Arctic Tug,* 956 P.2d at 1203 (describing questions concerning scope of specific duty as essentially questions "of whether particular conduct did or did not breach [that duty] (i.e., constitute negligence)").

**53.** AS 09.50.250 provides in relevant part:

A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state.... However, an action may not be brought if the claim
(1) is an action for tort, and is based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation is valid; or is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused.

**54.** *Id.*

**55.** *State v. Abbott,* 498 P.2d 712, 720 (Alaska 1972).

**56.** *Johnson v. State,* 636 P.2d 47, 64 (Alaska 1981).

**57.** *Id.*

**58.** *Adams v. State,* 555 P.2d 235, 244 (Alaska 1976) ("[T]he basic policy decision to undertake an activity is immune, but the execution is not."); *see also Japan Air Lines Co. v. State,* 628 P.2d 934, 938 (Alaska 1981) (holding that the decision to build a runway for wide body jets was a policy decision but that once the decision was made, "the state was obligated to use due care to make certain that the taxiway met the standard of reasonable safety for its users"); *Carlson v. State,* 598 P.2d 969, 973 (Alaska 1979) (holding that the decision to maintain highway turnouts was discretionary, but once made "the State is under a duty to act with reasonable care"); *Abbott,* 498 P.2d at 722 ("Once the basic decision to maintain the highway in a safe condition throughout the winter is reached, the state should not be given discretion to do so negligently.").

**59.** *Adams,* 555 P.2d at 244.

**60.** *Estate of Arrowwood v. State,* 894 P.2d 642, 645 (Alaska 1995) (quoting *Japan Air Lines Co.,* 628 P.2d at 936).

**61.** *Industrial Indem. Co. v. State,* 669 P.2d 561, 563 (Alaska 1983).

**62.** *Id.*

the executive departments." [63] Finally, we have recognized that discretionary function immunity protects the public's interest "in preventing the enormous and unpredictable liability that would result from judicial reexamination of the decisions of the other branches of government." [64]

■■■ Our cases have recognized that if decisions require the state to balance "the detailed and competing elements of legislative or executive" policy, they nearly always deserve protection by discretionary function immunity.[65] Similarly, "[d]ecisions about how to allocate scarce resources," will ordinarily be immune from judicial review.[66] On the other hand, we have ruled that "if the state has breached a statute or regulation expressly requiring it to act under specific circumstances, its decisions are not protected by discretionary function immunity." [67] And when a statute or regulations are permissive—simply neutral—a decision is more likely protected, especially when the permissiveness suggests a need to balance policy-related considerations.[68]

■■■ Although the dividing line between planning and operational decisions may often be hard to discern,[69] we have long recognized that, "[u]nder the planning/ operational test, 'liability is the rule, immunity the exception.' " [70] And when the state acts without the protection of discretionary function immunity, "the scope of the state's duty should be defined by ordinary negligence principles." [71]

> By ... applying traditional concepts of tort liability, the administration is not being told that it may not make a particular decision and act pursuant thereto. It is merely being made to pay the entire foreseeable costs of its activities.[72]

Here, the Guerreros argue that once it undertook to build the A/C couplet, the department was required to implement its decision safely. So in the Guerreros' view, the department's design and construction decisions automatically became operational and cannot be treated as immune policy or planning choices. We have no quarrel with the Guerreros' premise that the department's decision to undertake the A/C couplet obliged it to implement the project safely. But the department's undeniable duty to act safely did not automatically shift all of its post-undertaking decisions to the operational side of the planning/operational dichotomy.

■■■ In *Japan Air Lines Co. v. State*, for instance, we held that once the state made a basic policy decision to build an airport taxiway for jumbo jets, its ensuing design decisions "were operational decisions which merely implemented the basic policy formulation to build a [suitable] taxiway." [73] Yet in summarizing the basis for our decision, we emphasized that it turned on the nature of the design decisions at issue, and did not

63. *Id.*

64. *Abbott*, 498 P.2d at 721–22.

65. *Industrial Indem.*, 669 P.2d at 563.

66. *Adams v. City of Tenakee Springs*, 963 P.2d 1047, 1051 (Alaska 1998); *see also Estate of Arrowwood*, 894 P.2d at 646 ("It is well established that both legislative appropriations and executive department budget decisions are discretionary functions immune from judicial inquiry."); *Industrial Indem.*, 669 P.2d at 564–65 ("Decisions regarding the allocation of scarce resources are usually discretionary, and thus immune from judicial inquiry.").

67. *Kiokun v. State, Dep't of Pub. Safety*, 74 P.3d 209, 218–19 (Alaska 2003).

68. *Id.* at 216, 219 (finding the decision of a state trooper not to commence a search-and-rescue operation to be discretionary since the regulations were permissive and "before troopers decide whether to launch a search or a rescue, they must evaluate weather and safety conditions, determine if suitable resources are available, and generally weigh the risks against the benefits of a particular endeavor"); *State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 457–58 (Alaska 1997) (holding that where Department of Transportation regulations did not require department officials to enforce vehicle regulations, the department's decision not to do so was discretionary).

69. *Abbott*, 498 P.2d at 721.

70. *Sanders*, 944 P.2d at 457 (quoting *Johnson*, 636 P.2d at 64).

71. *Abbott*, 498 P.2d at 724.

72. *Id.* at 726.

73. *Japan Air Lines Co.*, 628 P.2d at 938.

automatically flow from the state's commitment to undertake the runway project:

> In summary, the state may be held liable for injuries which result from negligent designs. The issue, as always, is whether the design decision in question involved a basic policy formulation . . . or whether the design decision at issue was merely part of the implementation or execution of a basic policy decision, and therefore not immune.[74]

More recently, in *Kiokun v. State, Department of Public Safety,* we similarly recognized that even though the state's decision to initiate a search-and-rescue operation amounts to a policy decision to take action, "not necessarily all[ ] decisions made after a search and rescue is commenced may be operational." [75] In each case, we recognized, the determination turns on the nature of the specific decision at issue.

The Guerreros nonetheless insist that their evidence here reveals various negligent operational design and construction decisions concerning the area of the A/C couplet near C Street and 22nd Avenue. For specific examples, the Guerreros point to the department's decisions not to install an overpass near the intersection, not to install a crosswalk, not to install an "overhead lighted crosswalk sign," not to install "traffic control devices to prohibit pedestrian crossing," and not to install "warning signs, such as an advance pedestrian crossing sign."

▮ Under our case law, some of these examples unmistakably belong in the category of immune policy and planning decisions. Our cases have previously recognized that decisions concerning the installation and location of traffic signals require substantial policy considerations and raise significant resource-allocation questions. They therefore qualify as immune under Alaska's planning-operational test of discretionary function immunity.[76] We have reached the same conclusion regarding the construction of pedestrian overpasses [77] and other highway projects requiring the state to allocate scarce traffic-safety resources.[78] To the extent that the Guerreros base their claim on the department's negligence in failing to build a pedestrian overpass near C Street and 22nd Avenue or to install a lighted crosswalk or other comparable traffic control devices, our cases indicate that discretionary function immunity would bar the claim unless the project at issue—here, the A/C traffic couplet—was governed by clearly established standards that mandated their installation.

In *Jennings v. State,* for example, we considered the case of a child killed by a car while she walked across an intersection on her way home from school. The accident site had not been designated as a school zone and fell outside the mandatory school-zone boundaries specified by state regulations. Given these circumstances, we held that the state's failure to designate the intersection as a school zone or take other safety measures, such as building a pedestrian overpass, had "rightly been characterized [by the superior court] as planning level decisions, and thus within the ambit of the statutorily created discretionary function exception to the state's tort liability." [79] Yet after noting that a different safety regulation would have applied to a school zone,[80] we went on to observe that we might have reached the opposite conclusion if the state had actually chosen to include the intersection in a school zone: "[H]ad the planning level decision been made to delineate this area a school zone and then the state negligently signed the area or negligently constructed a crosswalk, a cause of action might have arisen against the state for these negligently performed operational level acts." [81]

74. *Id.*

75. *Kiokun,* 74 P.3d at 218.

76. *Wainscott v. State,* 642 P.2d 1355, 1357 (Alaska 1982).

77. *Jennings v. State,* 566 P.2d 1304, 1311 (Alaska 1977).

78. *Industrial Indem.,* 669 P.2d at 564–65.

79. *Jennings,* 566 P.2d at 1312.

80. *Id.* at 1311 n. 28.

81. *Id.* at 1312 n. 30.

·In keeping with this cautionary note from *Jennings*, we later held in *Japan Air Lines Co. v. State* that immunity did not apply to design decisions made after the state decided to build an airport runway for wide body jets that turned out to be dangerously narrow.[82] Citing *Jennings*, we held that, because nationwide standards established the minimum width for runways to be used by wide body jets, once the state made the policy decision to build a runway for wide body jets, its ensuing decision to design and build the runway merely implemented its policy choice and amounted to an operational action.[83]

Here, the Guerreros have not identified any special standards that became applicable to the intersection of C Street and 22nd Avenue by virtue of the department's decision to build the A/C couplet. And the law and regulations that ordinarily guide the department in deciding when to build pedestrian overpasses and install traffic signals do not appear to call for additional safety measures of this kind.

Alaska law distinguishes between "traffic control signals" on the one hand, and highway signs—or "marking and posting"—on the other, addressing these categories in two related provisions of the Alaska Statutes.[84] Both provisions, in turn, recognize and incorporate the nationwide standards set out in the 1988 *Traffic Manual*—the version of the *Manual* that was in effect at the time of Guerrero's accident.[85] The two statutes expressly require that the department's regulations "must correlate with and, as far as possible, conform to" the *Traffic Manual's* recommendations.[86] The *Traffic Manual* itself sets out a broad array of recommendations for using various kinds of traffic signals, devices, and signs.

On the subject of traffic signals, the *Traffic Manual* lists a set of four criteria, or "warrants," to be used in determining whether a traffic signal should be installed at a given location. Evidence in the record, including evidence from the Guerreros' own expert indicates that the intersection of C Street and 22nd Avenue meets none of these warrants: The intersection does not have significant vehicular cross traffic; it is not a designated school crossing; it has not experienced numerous accidents; and it does not meet the minimum requirement for pedestrian volume.[87] Although the *Traffic Manual* does not categorically prohibit installing a signal when none of these warrants is met, it does · expressly recommend against taking such action, advising that in such situations, "[t]raffic control signals should not be installed."[88] Because the department had a statu-

82. *Japan Air Lines Co.*, 628 P.2d at 938.

83. *Id.* at 937 n. 2 (distinguishing the holding in *Jennings* by pointing out the cautionary discussion in that opinion's footnote 30).

84. Specifically, traffic control signals are addressed in AS 19.10.050, while highway signs are covered by AS 19.10.040.

85. *See* U.S. DEPT. OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, MANUAL ON UNIFORM ·TRAFFIC CONTROL DEVICES (1988) [TRAFFIC MANUAL].

86. AS 19.10.040 provides in relevant part that the department
shall classify, designate, and mark highways under its jurisdiction and shall provide a uniform system of marking and posting these highways. The system of marking and posting must correlate with and, as far as possible, conform to the recommendations of the Manual on Traffic Control Devices as adopted by the American Association of State Highway Officials.
AS 19.10.050 provides in relevant part that the department

shall prescribe types of traffic control signals to regulate traffic on highways. These signals must correlate with and, as far as possible, conform to the recommendations of the Manual on Uniform Traffic Control Devices as adopted by the American Association of State Highway Officials. The department shall adopt uniform regulations for the placing and installation of traffic control signals.

87. The *Traffic Manual* requires a minimum of 100 pedestrians per hour for each of any four hours to justify installing a signal. TRAFFIC MANUAL, *supra* note 85, at 4C–4. Where pedestrians are slower than average, as small children might be, the requirement may be reduced by fifty percent. *Id.* at 4C–5. The report of the Guerreros' expert indicates that the highest number of pedestrians crossing C Street during the peak traffic hour was 27 and that the average was lower.

88. TRAFFIC MANUAL, *supra* note 85, at 4C–2 ("Traffic control signals should not be installed unless one or more of the signal warrants in this Manual are met.").

tory duty to conform its practices "as far as possible" with the *Traffic Manual's* recommendations, it would need a sound, independent policy reason before installing a sign against the *Traffic Manual's* recommendation. The Guerreros make no showing of any such reason; and even if they did, the department's failure to make a policy-based choice to disregard the *Traffic Manual's* recommendation would, by definition, amount to an immune policy decision.

 The department's decision not to place a crosswalk at the intersection is immune for similar reasons. Because a crosswalk would obviously affect traffic movement and could potentially conflict with the department's basic decision to use the A/C couplet to move traffic quickly into and out of downtown Anchorage, determining whether to locate a crosswalk at C Street and 22nd Avenue would require consideration of policies indistinguishable from those that would be involved in deciding whether to place a traffic signal at the intersection—a decision that our cases characterize as an immune policy choice.[89]

Moreover, the *Traffic Manual* points to the same conclusion. Specifically, in the circumstances at issue here, it appears to recommend *against* placing a crosswalk at C Street and 22nd Avenue. According to the *Traffic Manual*, crosswalks should be avoided absent a substantial conflict between pedestrians and traffic, and their installation across roads like C Street would not be justified unless supported by a formal study:

> Crosswalks should be marked at all intersections where there is substantial conflict between vehicle and pedestrian movements.... Crosswalk markings should not be used indiscriminately. An engineering study should be required before they are installed at locations away from traffic signals or STOP signs.[90]

The Guerreros submitted evidence of some conflict between pedestrians and traffic. But they have not shown "substantial conflict" under the Traffic Manual's criteria, and the department submitted evidence that only one reported injury-accident—Alexander Guerrero's—had occurred since the A/C couplet's completion. Even interpreted in the light most favorable to the Guerreros, the evidence fails to support a reasonable inference that the *Traffic Manual* would have recommended a crosswalk at 22nd Avenue and C Street.

The Guerreros fall even shorter of the mark in suggesting that the department committed operational negligence by failing to erect a pedestrian overpass. The foreseeably high costs of building a pedestrian overpass would inevitably raise concerns over allocating the department's resources, thus raising substantial policy issues. Moreover, the Guerreros do not point out any provision of law, regulation, or the *Traffic Manual* that would mandate or even recommend that an overpass be installed at the intersection of C Street and 22nd Avenue. And absent any evidence establishing a history of substantial conflict between pedestrian and traffic uses at the intersection there appears to be no reasonable basis to infer that an overpass might be required.

 By contrast, the Guerreros' remaining theory of operational negligence—that the department failed to post adequate warning signs at the intersection—raises a closer question. As previously noted, both Alaska law and the *Traffic Manual* draw distinctions between traffic signals and traffic signs. Alaska Statute 19.10.040 unequivocally requires the department to "mark highways under its jurisdiction" and to implement "a uniform system of marking and posting these highways." On three prior occasions we have unmistakably held that these provisions give the department an operational duty to exercise due care in ensuring that roadways have signs and markings that are adequate to protect the public from reasonably foreseeable traffic hazards.

In *State v. I'Anson*,[91] the department failed to stripe and mark a portion of the

**89.** *Wainscott,* 642 P.2d at 1357; *cf. Industrial Indem.,* 669 P.2d at 569 (Matthews, J., dissenting) (discussing rationale of *Wainscott* ).

**90.** Traffic Manual, *supra* note 85, at 3B–23.

**91.** 529 P.2d 188 (Alaska 1974).

highway to establish a no-passing zone at a point where the highway joined with an access road. A serious accident occurred when a car attempted to turn onto the access road and was hit from behind by a motorist trying to pass in the highway's left lane. Although the *Traffic Manual* would have called for a no-passing zone to be marked at the site, the department argued that deciding whether to create a no-passing zone involved planning and policy, and so was protected under the discretionary function immunity exception. But we rejected this argument, holding that

> functions of this nature do not involve broad basic policy decisions which come within the "planning" category of decisions which are expressly entrusted to a coordinate branch of government.... [R]esolution of questions such as whether or not the state properly striped or marked a portion of highway as it relates to the state's duty of care to users of the highway presents facts that courts are equipped to evaluate within traditional judicial fact-finding and decision-making processes.[92]

We later reached the same conclusion in *Johnson v. State*,[93] a case concerning the state's failure to post an adequate warning sign. There, a bicyclist was injured in an accident caused by railroad tracks crossing the road at an unmarked spur. The state did not deny its duty to provide and maintain signs warning of foreseeable hazards. It nevertheless argued that, because the railroad spur had been included in the plans for the road before the road was initially built, the decision not to post a warning sign was an original design decision and, as such, was immune.[94] We rejected this argument. Relying on *I'Anson,* we categorically ruled in *Johnson* that "the decision to sign is operational and hence not immune."[95]

And more recently, in *Guerrero I,* we observed that our cases "have placed certain

kinds of government actions on the operational side of the operational/planning balance: highway maintenance, painting lane markings on highways, [and] posting highway signage[.]"[96]

The department nevertheless insists that our most recent case law retreats from these precedents and favors a "more modern" view that would grant immunity to signing decisions. In support of this argument, the department relies chiefly on *Walden v. Department of Transportation*.[97] But as we already observed in discussing the department's duty argument, the department misreads *Walden*.[98] There, Walden claimed that the department's duty of due care required the department to post a specific warning sign at the accident site; to support this claim, Walden relied completely on the allegation that the *Traffic Manual* recommended posting a sign at that location; but as it turned out, the *Manual* did not recommend installing the sign.[99] Our decision in *Walden* simply recognized that under these facts, the department's general duty of due care did not create an actionable duty to install that particular warning sign.

The department cites *Searles v. Agency of Transportation*[100] as additional authority for its argument that signing decisions should be treated as immune. There, the Vermont Supreme Court rejected as barred by immunity a negligent-marking claim alleging that the state had failed to comply with the *Traffic Manual's* recommendations for marking a no-passing zone. In reaching its decision, the court in *Searles* described the *Traffic Manual* as merely "a guidebook for the installation of signs" and held that decisions concerning highway marking and signs were immune because they "involve[ ] an element of judgment or choice."[101]

---

92. *Id.* at 193–94.

93. 636 P.2d 47 (Alaska 1981).

94. *Id.* at 66.

95. *Id.*

96. *Guerrero I,* 6 P.3d at 261.

97. 27 P.3d 297 (Alaska 2001).

98. *See* discussion above, pp. 974–76.

99. *Walden,* 27 P.3d at 302.

100. 171 Vt. 562, 762 A.2d 812 (2000).

101. *Id.* at 815.

■ But in sharp contrast to *Searles's* reliance on the mere presence of an element of judgment or choice, our own immunity rulings have consistently emphasized that not all acts that involve discretion or judgment are immune, for "almost any act, even driving a nail, involves some 'discretion.' " [102] Furthermore, in holding that failure to properly mark and sign highways amounts to non-immune operational negligence, *State v. I'Anson* relied largely on Alaska's specific statutory provision directing the department, "as far as possible, [to] conform to the recommendations of the [*Traffic Manual* ]." [103] Finally, the conflict between *Searles* and *I'Anson* simply establishes a disagreement; the mere fact that Vermont disagrees with Alaska's view of immunity cannot by itself justify overturning our settled precedent.[104]

The department does not offer any convincing reason to retreat from our holdings in cases like *I'Anson* and *Johnson*.[105] As we recognized in those cases, installing appropriate warning signs will generally entail straightforward decisions involving implementation. Given Alaska's statutory directive to follow the *Traffic Manual's* recommendations when reasonably possible,[106] there is little reason to think that immunity is needed to protect the department from unforeseeable liability. Furthermore, as the Guerreros correctly maintain, installing signs is relatively inexpensive and does not implicate the same resource-allocation concerns raised by the high costs of installing traffic signals, lighted crosswalks, and pedestrian overpasses. Finally, warning signs are less likely than signals and crosswalks to pose serious risks of conflicting with previously established policy choices. We thus find no sound basis for elevating these kinds of decisions to the level of basic policy and planning decisions.

## 3. Alternative Summary Judgment Theories

Two alternative summary judgment grounds remain for us to consider: negligence and causation. The Guerreros claim that the department acted negligently in failing to provide two different kinds of warning signs: signs warning pedestrians against crossing C Street at 22nd Avenue and signs warning approaching motorists on C Street that pedestrians might be crossing the roadway at 22nd Avenue. They assert that this negligence caused Alexander's injuries. As the moving party, the department had the "entire burden" of proving its right to summary judgment; unless the department advanced prima facie evidence of non-negligence or lack of causation, the Guerreros had no duty to submit evidence supporting their allegations on these points.[107]

On appeal, the department has not expressly argued that it established a prima facie case of non-negligence or lack of causation. But it indirectly raises these issues. A claim of non-negligence seems implicit in its argument that it had no duty to post signs at the accident site; and the department presented evidence on this point with its motion for summary judgment: state traffic safety expert Ron Martindale submitted an affidavit suggesting that there was no need for warning signs at the intersection. The department similarly raises an implied claim of lack of causation; it argues that the Guerreros'

---

**102.** *Abbott*, 498 P.2d at 720.

**103.** AS 19.10.040.

**104.** As we recently reaffirmed in *Thomas v. Anchorage Equal Rights Commission*, 102 P.3d 937, 943 (Alaska 2004), we do not lightly overrule our precedent:

> [W]e have consistently held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling: "We will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because

of changed conditions, and that more good than harm would result from a departure from precedent."
*Id.* (quoting *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003) (internal quotations omitted)).

**105.** *Johnson*, 636 P.2d at 66 ("[T]he decision to sign is operational and hence not immune."); *State v. I'Anson*, 529 P.2d 188 (Alaska 1974).

**106.** AS 19.10.040.

**107.** *Barry v. University of Alaska*, 85 P.3d 1022, 1025–26 (Alaska 2004) (quoting *Braund, Inc. v. White*, 486 P.2d 50, 54 n. 5 (Alaska 1971)).

warning-sign claims are not "factually related" to Alexander Guerrero's accident, specifically contending that a "No Pedestrian Crossing" sign would have been useless because Alexander did not know how to read and that an advance "School Crossing" sign would have been futile because Alexander was not a student and the accident occurred outside the usual hours of school.

For purposes of considering these points, we assume that the department made a prima facie showing of non-negligence and lack of causation; our inquiry thus centers on determining whether the Guerreros presented any rebuttal evidence raising genuine issues of material fact on negligence and causation.

### a. Negligence

The Guerreros rely partly on the *Traffic Manual* as evidence supporting their claim that the department acted negligently in failing to post warning signs. The *Manual* establishes three levels of recommendation for warning signs: "shall," "should," and "may." It defines them as follows:

1. SHALL—a *mandatory* condition. Where certain requirements in the design or application of the device are described with the "shall" stipulation, it is mandatory when an installation is made that these requirements be met.

2. SHOULD—an *advisory* condition. Where the word "should" is used, it is considered to be advisable usage, recommended but not mandatory.

3. MAY—a *permissive* condition. No requirement for design or application is intended.[108]

■ Although the *Manual* emphasizes that these recommendations are not legal requirements,[109] they nonetheless provide useful and authoritative guidance concerning the level of care that would generally be necessary to meet the department's operational duty to post adequate traffic signs. In a case where the *Traffic Manual* merely suggests that a sign "may" be posted, it simply describes "a permissive condition." [110] This designation recognizes that installing a sign is generally an acceptable option under the specified conditions, but it gives no specific advice as to what choice the department should actually make. A "may" recommendation thus creates no inference that failing to install a sign amounts to negligence in any particular case.

■ By contrast, the *Manual* does affirmatively give advice when it says that a sign "should" be installed, specifically declaring that, under the stated conditions, installing a sign "is considered to be advisable usage." [111] This amounts to a qualified recommendation: it advises that due care would generally call for installing a sign, but also recognizes considerable leeway for individual exceptions.[112]

The *Manual's* advice grows even stronger when it says that a sign "shall" be installed: by defining "shall" as a "mandatory condition," the *Manual* unequivocally advises that when the specified conditions are met, due care requires installing a sign in all but extraordinary cases.[113]

---

108. Traffic Manual, *supra* note 85, at 1A–4.

109. *Id.*

110. *Id.*

111. *Id.*

112. We reject the department's argument that no genuine dispute concerning operational negligence can be based on the *Traffic Manual's* provisions unless the *Manual* leaves no room for discretion by unequivocally requiring that a sign be installed. The argument disregards AS 19.10.040's explicit directive to conform to the *Traffic Manual's* "recommendations"; and it directly conflicts with our holding in *Johnson v.*

*State,* which recognized that a viable claim for negligent failure to post a warning sign could exist even though the warning sign at issue there was " 'non-standard,' that is, not provided for in the then current Alaska Traffic Manual[.]" *Johnson,* 636 P.2d at 66 n. 40. *Johnson's* ruling on this point establishes that, although the *Traffic Manual's* recommendations can provide useful guidance in determining whether the department complied with or violated its duty to exercise due care in signing and marking highways, the recommendations will not control that issue if independent evidence supports a finding that the department acted negligently despite the absence of an affirmative recommendation by the *Manual.*

113. Traffic Manual, *supra* note 85, at 1A–4.

As applied to the two types of warning signs at issue here—"No Pedestrian Crossing" signs and "Advance Crossing" signs (that is, signs giving motorists advance warning that pedestrians may be crossing the roadway), the *Traffic Manual* produces different recommendations. As to no-crossing signs, the *Manual* takes the neutral position that posting "may" be appropriate:

> Pedestrian Crossing signs may be used selectively to aid in limiting pedestrian crossing to safe places.... The No Pedestrian Crossing sign may be used to prohibit pedestrians from crossing a roadway at a point which is considered to be hazardous, especially in front of a school or other public building where a crossing is not designated.[114]

As noted above, because this recommendation is merely permissive it does not imply the existence of negligence or non-negligence in any particular case.

As to "Advance Crossing" signs, the *Manual* takes a stronger position, recommending that "Advance Crossing signs *should be* used to alert vehicle operators to unexpected entries into the roadway by pedestrians, trucks, bicyclists, animals, and other potential conflicts."[115] Because "should" affirmatively advises installing a sign in specified situations, this recommendation alone, if shown to apply to the disputed intersection, would raise a triable question of fact on the issue of negligence.[116]

■■■ Here, the required showing was made. The Guerreros submitted an affidavit signed by their own traffic expert, Edward M. Stevens, who concluded that crossing C Street at 22nd Avenue on foot in times of heavy traffic would be "inherently unsafe," especially for young children. According to Stevens, "[w]arning signs, such as an advance pedestrian crossing sign, a pedestrian crossing sign, or a no pedestrian crossing sign, were appropriate with the intersection of 22nd avenue and C street." Stevens based his opinion on gap and traffic-volume studies of the specific intersection. These studies reveal that: (1) "[t]he location nearly meets gap warrant criteria for a grade-separated pedestrian over-crossing;" and (2) "[t]here were several 15 minute periods when no acceptable [time delays sufficient for a pedestrian to cross] were recorded." Stevens's expert opinion could support a reasonable inference that conditions at the intersection triggered the *Manual's* recommendation that advance warning signs "should" be installed. Therefore, Stevens's affidavit, coupled with the *Manual's* recommendation, raises a triable issue of fact as to the department's negligence in failing to install an advance-warning sign.

To be sure, as already mentioned, the department offered opposing evidence from its own traffic safety expert, Martindale, who emphasized that unnecessary use of warning signs can be counterproductive because it breeds disrespect for all signs.[117] Yet the general proposition that signs should not be overused fails to address the specific conditions at the intersection of 22nd Avenue and C Street. The Guerreros presented evidence showing that a heavily used footpath led from the Loussac Manor housing complex to C Street and 22nd Avenue and that this intersection, in turn, provided the most direct

---

114. TRAFFIC MANUAL, *supra* note 85, at 2B–29.

115. *Id.* at 2C–16 (emphasis added).

116. The inference of negligence seems especially apt given AS 19.10.040's provision requiring the department to comply as far as possible with the *Manual's* advice.

117. We note that in the superior court, the department's motion for summary judgment argued that Martindale's affidavit established a lack of any actionable duty, not the absence of negligence:

> Alexander's parents had warned him of the dangers of C Street. This five year old child could not read, and thus any warning sign would presumably be even less effective than his parents' instructions.... [T]he State has no duty to warn citizens ... of the obvious dangers of running into traffic on a busy street. Such warnings would have to be everywhere, and yet they would still fail to reach illiterate five year olds.

(Citations omitted.) This focus on duty seems misguided, since the fact that some youthful pedestrians might not be able to read a no-crossing sign or might disregard parental warnings would not relieve the state of its duty to protect the many other pedestrians who presumably would understand and be willing to heed such a sign.

route to a nearby elementary school on the far side of C Street. Viewed in the light most favorable to the Guerreros, this evidence would tend to refute Martindale's implied assertion that the intersection at C Street and 22nd Avenue was no more dangerous than other unmarked intersections along the A/C couplet, so a genuine dispute of material fact exists as to the need for an advance-warning sign.

The Guerreros' evidence similarly raises a genuine issue of fact concerning potential negligence in failing to install a "No Pedestrian Crossing" sign. Stevens's affidavit could support a finding that the department violated its duty of due care in failing to install a "No Pedestrian Crossing" sign; this evidence thus independently tends to show negligent conduct, despite the *Manual's* neutral "may" recommendation as to the general advisability of posting "No Pedestrian Crossing" signs.

The conflicting evidence in the record concerning these points thus precludes the department from claiming that it was entitled to summary judgment because of unrebutted evidence showing that it acted non-negligently in failing to post warning signs.

### b. Causation

The record similarly contains conflicting evidence precluding the department from prevailing on the alternative theory that its failure to post warning signs could not have caused Alexander's injury. As already mentioned, the department reasons that a sign prohibiting pedestrians from crossing C Street would have been futile because Alexander was too young to know how to read, and that a sign warning motorists that the intersection was a school crossing would have been useless because Alexander was not a student and the accident occurred outside the usual hours of school.

These arguments mistakenly assume that the Guerreros limited their claim to the department's failure to post signs warning motorists to beware of students crossing C Street or signs warning in writing that pedestrians should not cross the street. The Guerreros' negligent signing claim and their supporting evidence asserted broader positions. Because the criteria specified in the *Traffic Manual* for "Advance Crossing" signs broadly include all "potential conflicts" between pedestrians and motorists [118]—not just conflicts between student pedestrians and motorists—we see no basis for assuming that the department would only have needed to post advance-warning signs that alerted motorists to the danger of students crossing C Street during normal school hours. Neither the Guerreros' negligent warning sign claim nor their expert's affidavit was confined to this narrow theory.

■ Furthermore, insofar as the Guerreros asserted that the department was negligent in failing to install "No Pedestrian Crossing" signs, we find little reason to assume that Alexander's inability to read would necessarily rule out causation. The sample "No Pedestrian Crossing" sign set out in the *Traffic Manual* consists of a non-textual warning: it uses no words and simply depicts the figure of a pedestrian in the middle of a red circle with a diagonal slash drawn through the figure.[119] The *Manual* expressly points out that either this pictorial warning or a "word message sign" may be used when a "No Pedestrian Crossing" sign is installed.[120] Neither Alexander's illiteracy nor his parents' prior warnings would necessarily preclude a finding that he might have understood and heeded a simple, clear, and immediate picture warning like the one in the *Manual*. Since the state failed to produce any evidence establishing that a pictorial sign could not have been posted or that Alexander could not have understood and heeded such a sign, we conclude that the record fails to reveal undisputed evidence demonstrating that it was entitled to summary judgment based on lack of causation.

### IV. CONCLUSION

Because the record establishes that the corporation owed no duty to protect the

---

**118.** Traffic Manual, *supra* note 85, at 2C–16

**119.** *Id.* at 2B–30.

**120.** *Id.* at 2B–29.

Guerreros from the dangers of traffic on the A/C couplet, we AFFIRM the order granting the corporation's motion for summary judgment. But because genuine issues of material fact exist as to the Guerreros' claim that the department negligently breached an operational duty to post no-crossing signs and advance-warning signs on C Street, we hold that it was error to grant the department's motion for summary judgment on the negligent signing claim, REVERSE the order summarily dismissing that claim, and RE-MAND for further proceedings on the claim. We AFFIRM the summary dismissal of all other aspects of the Guerreros' claims against the department, concluding that those claims are barred by discretionary function immunity.